## IN THE CIRCUIT COURT FOR
## BULLOCK COUNTY, ALABAMA

| | | |
|---|---|---|
| **BARBARA D. GRAHAM,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | CASE NO. _CV -05- 68_ |
| | * | |
| **WYETH, et al.** | * | |
| | * | |
| **Defendants.** | * | |

## PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT JENNIFER ANDREWS

Pursuant to Rule 33 and 34 of the *Alabama Rules of Civil Procedure*, the Plaintiff propounds the following interrogatories and requests for production of documents to be answered by Defendant Jennifer Andrews, a Party Defendant, in the manner and form prescribed by law:

## DEFINITIONS

1. "Documents" shall mean writings of every kind, source and authorship, both originals and all non-identical copies thereof, in your possession, custody or control, or known by you to exist, irrespective of whether the writing is one intended for or transmitted internally by you or intended for or transmitted to any other person or entity, including, without limitation, any government agency, department, administrative entity or personnel. The term shall include handwritten, typewritten, printed, photocopied, photographic or recorded matter. It shall include communications in words, symbols, pictures, sound recordings, films, tapes and information stored in, or accessible through, computer or other information storage or retrieval systems, together with the codes and/or programming instructions and other materials necessary to understand and use such systems.

2.     For purposes of illustration and not limitation, the term "Documents" shall include: correspondence, transcripts of testimony, letters, notes, reports, papers, files, books, records, contracts, agreements, telegrams, teletypes and other communications sent or received, diaries, calendars, logs, notes or memoranda of telephonic or face-to-face conversations, drafts, work papers, agendas, bulletins, notices, circulars, inserts, announcements, instructions, schedules, minutes, summaries, notes and other records and recordings of any conferences, meetings, visits, statements, interviews or telephone conversations, bills, statements and other records of obligations and expenditures, canceled checks, vouchers, receipts and other records of payments, ledgers, journals, balance sheets, profit and loss statements, and other sources of financial data, analyses, statements, interviews, affidavits, printed matter (including published books, articles, speeches and newspaper clippings), press releases, charts, drawings, specifications, manuals, brochures and memoranda of all kinds to and from any persons, agencies or other entities.

3.     "Identify", when used in reference to a person, means to state that person's full name, name of his or her employer, job title or position, and that person's last known residence and business addresses and telephone numbers.

4.     Any reference to the word "medicine, pharmaceutical, drug or product" is intended to and shall mean those products known generally as hormone therapy drugs and all other trade names or trade marks under which hormone therapy drugs have been tested, sold or marketed.

## INTERROGATORIES

1.    State your full name, date of birth, social security number, and driver license number.

2.    State each of your places of residence for the past ten (10) years.

3.    State the names and addresses of each person to whom you have been married.

4.    List each social organization in which you have been a member over the past five (5) years.

5.    Have you ever been arrested, charged with a criminal offense, or investigated where a criminal offense was suspected?

6.    Have you ever been sued? If so, state the name of the plaintiff, the date the suit was filed, the nature of the suit, the name and address of plaintiff's lawyer, and the court.

7.    State your employment history for the past fifteen (15) years, giving names of employers, places of employment, and job titles.

8.    State the name and address of your immediate supervisor in each of your places of employment, including the present supervisor.

9.    State the relationship between yourself and any other Defendants in this lawsuit. Please produce any documents that are evidence of such relationship.

10.    State with particularity any and all training you have received concerning the sale of hormone therapy drugs. Include in your answer the dates of such training, the nature of such training and the person or persons providing such training.

11.    Please state whether you have ever attended any seminars relative to hormone therapy drugs. For each such seminar, please state the date, time, place, topic and sponsor of each seminar.

## REQUESTS FOR PRODUCTION

1.    All contracts and/or agreements between you and any other Defendant.

2.    Contract(s) of employment and all other documents that may describe the terms and conditions your employment for the Wyeth Defendants in the representation, detailing, and/or sales of hormone therapy drugs, including but not limited to the manner in which your compensation was calculated.

3.    All documents sent to you or received by you from any other Defendant.

4.    All brochures, training materials, manuals, directives, handbooks, bulletins or other documents received by you from any other Defendant.

5.    All documents in your possession pertaining in any way to your employment with the Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. (hereinafter referred to as the "Wyeth Defendants").

6.    Produce all materials provided to you by the Wyeth Defendants regarding hormone therapy drugs, including their benefits and risks.

7.    Produce all marketing materials provided to you by the Wyeth Defendants that were designated by as materials that are not to be left with physicians called upon.

8.    All product launch materials provided to you by the Wyeth Defendants, including but not limited to, all product information, marketing information, sales training materials, question/answer sheets (situational examples of how to answer physician concerns), approved sales training aides, launch notebook, and the like.

9.    All product information ever provided to you by the Wyeth Defendants

10.    All marketing information ever provided to you by the Wyeth Defendants

11.    All sales training materials ever provided to you by the Wyeth Defendants

12.     All question/answer sheets (situational examples of how to answer physician concerns) provided to you by the Wyeth Defendants

13.     All approved sales training aides provided to you by the Wyeth Defendants.

14.     All correspondence sent to or received from the Wyeth Defendants relating in any manner to hormone therapy drugs, including copies or print-outs of any/all e-mail transmissions and their attachments.

15.     Records of all communications received by you from any physician or other healthcare provider regarding hormone therapy drugs, including but not limited to notes and memoranda of telephone conversations, e-mail inquiries and responses, written correspondence, etc.

16.     Records of all communications made by you to any physician or other healthcare provider regarding hormone therapy drugs, including but not limited to notes and memoranda of telephone conversations, e-mail inquiries and responses, written correspondence, etc.

17.     All records, including diaries, appointment calendars, expense records or the like, that will show the calls made upon physicians, including Dr. Stuart May, or other health care providers by you to detail or otherwise represent hormone therapy drugs to the physician or other healthcare provider.

18.     Copies of all call records, activity reports, expense reports, sales records, order or canceled orders for hormone therapy related materials, including but not limited to samples, product information, patient information packets.

19.    All documents, videos, tapes, e-mails or any information in your possession pertaining to hormone therapy drugs.

_Melissa Prickett_
Jere L. Beasley(BEA020)
Andy D. Birchfield, Jr. (BIR006)
Ted G. Meadows (MEA014)
Melissa A. Prickett (PRI068)
Attorneys for Plaintiff

OF COUNSEL:

BEASLEY, ALLEN, CROW, METHVIN,
    PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343

Myron C. Penn
PENN & SEABORN
Post Office Box 688
Clayton, Alabama 36016

## CERTIFICATE OF SERVICE

I hereby certify that I have filed a copy of the foregoing document with the Circuit Clerk along with the Summons and Complaint on this the 3rd day of June, 2005.

_Melissa Prickett_
OF COUNSEL

## IN THE CIRCUIT COURT OF
## BULLOCK COUNTY, MISSISSIPPI

BARBARA D. GRAHAM,                          *
                                            *
     Plaintiffs,                          *
                                            *
v.                                          *  CASE NO. $CV - 05 - 68$
                                            *
WYETH, et al.,                              *
                                            *
     Defendants.                          *


## PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS QUALITEST PHARMACEUTICALS, INC.

Pursuant to Rules 33 and 34 of the *Alabama Rules of Civil Procedure*, Plaintiffs propound the following interrogatories and requests for productions of documents to be answered by Qualitest Pharmaceuticals, Inc., party Defendant, in the manner and form prescribed by law:

### INTERROGATORIES

1.    State the legal name of this Defendant and identify all persons answering the following discovery on behalf of the Defendants.

2.    State the relationship between this Defendant and any other Defendant in this lawsuit. Produce any documents that are evidence of such relationship.

3.    Please provide the name, title, and business address of each individual who assisted in the gathering of the documents responsive to plaintiff's first request for production.

4.    Identify each and every research center, laboratory, hospital, health center or clinical study group, or other business enterprise or organization by whatever name known, that

this Defendant has used or contracted with to conduct studies on MPA, or any hormone therapy drug. For each such entity, please state the following:

    a.  Name of center;

    b.  Primary contact at center;

    c.  Primary contact person for this defendant;

    d.  Address of the center;

    e.  Area code and telephone number for the center;

    f.  Website address/URL.

5.    For the years 1995 to the present, please identify the person who has held the following positions, or was responsible for the following functions within your company and state whether such person was an employee of the company:

    a.    President/CEO.

    b.    Head of scientific/medical affairs

    c.    Head of research

    d.    Chief medical officer

    e.    Head of communication with research centers

For each person identified in this interrogatory, state the extent of all post high school education, including formal degrees received and date of matriculation. Also, if any person identified in this interrogatory has not graduated from high school please state the highest grade completed.

6.    Describe what actions this defendant takes with regard to investigating any suspected adverse reaction to MPA of which it becomes aware, and whether such information, or

any summary or part thereof, is ever systematically or routinely reported to the FDA, or any state or local governmental body, or poison control center, or any other organization or agency.

7.    Identify each and every medical, scientific journal or text, or other writing, which you reviewed, relied upon or in any way considered in connection with marketing of MPA. Please set forth your best estimate of the date that you reviewed such writing.

8.    Identify each and every medical, scientific or other writing which you, reviewed, relied upon or in any way considered prior to first marketing MPA to support the safety for its intended purpose(s).

9.    What is the intended use or uses for which this Defendant marketed and sold MPA?

10.    Identify every scientific survey, marketing research, human factors analysis or other "writing" which you, conducted, reviewed, or relied upon in your design of every MPA label. This interrogatory seeks information about all research in connection with the label including consumer understanding of the label, the effectiveness of the label, consumer compliance with label instructions, and design of the label including but not limited to the, size, type face, color, case and layout.

11.    Identify every individual or entity that contributed to the content or design of the label for MPA. Please include the dates and substance of the contribution of the label.

12.    Identify and describe each and every medical, scientific study to which you contributed money directly or indirectly to determine the safety or the effectiveness of MPA or any other hormone therapy drug. This interrogatory calls for the names of the investigators, the names of the institution at which the study was conducted and the dates of the study/studies.

13.    Please set forth each and every system or procedure established and utilized by you to obtain and document consumer reports of any adverse reaction or any unintended health effects from the use of MPA. This interrogatory calls for a general description of the system and the dates during which it was used and the persons who implemented and supervised the system.

14.    Please describe every system or procedure established and utilized by you to obtain information from any state or federal regulatory agency including but not limited to the FDA, any state department of health, or any federal, state or local poison control center regarding adverse events reported from the use of hormone therapy drugs.

## REQUESTS FOR PRODUCTION

Plaintiff specifically requests that this defendant produce the following:

1.    Produce each and every policy of insurance which you believe may provide coverage for the injury to plaintiff in the herein action. Include each general liability, comprehensive general liability, advertising liability or product liability insurance policy, for the claims asserted in this litigation that you purchased or on which you are a named insured (including policies purchased by related corporate entities), including all excess layers, for the years 1995 to the present.

2.    Produce any charts or schedules of layers of insurance or self-insured retention for any of the respective years of coverage.

3.    Produce any documents relating or referring to any disputes or reservations of rights as to coverage.

4.    Produce all documents relating, referring to or embodying your document retention or document destruction policies in effect for the years 1995 to the present.

5.    For each year between 1995 to the present produce all corporate organizational charts. Such documents should include documents setting forth the identity of the corporate officers, their positions and general responsibilities, and setting forth the members of the Board of Directors.

6.    Produce all documents relating, referring to or embodying any codes of conduct or standards promulgated, adopted or followed by each Defendant between 1995 to the present with respect to the marketing or labeling of hormone therapy drugs including, but not limited to, MPA.

7.    Produce any civil complaint filed against you regarding the use of hormone therapy drugs including, but not limited to, MPA.

8.    Produce all documents (including, but not limited to, depositions, deposition notices, court orders direction the corporation to produce a witness for deposition) relating, referring to or embodying the testimony of current or former officers and employees of each Defendant to this action in any state or federal court litigation. (This request calls for deposition transcripts <u>with exhibits</u> and for electronically stored data such as diskettes, CD's and videotapes of depositions or deposition exhibits.)

9.    Produce all documents relating, referring to or embodying the deposition testimony of <u>consultants or experts</u> retained by Defendant or any of its current or former counsel, in defense of any other action – civil or criminal – relative to other state or federal court litigation. (This request calls for deposition transcripts <u>with exhibits</u> and for electronically stored data such as diskettes, CD's and videotapes of depositions or deposition exhibits.)

10.    Produce all documents relating, referring to or embodying any medical, scientific or other writing which you actually reviewed, relied upon or in any way considered in connection with devising the formula of MPA.

11.    Produce all documents relating, referring to or embodying medical scientific or expert opinions that you actually reviewed, relied upon or in any way considered regarding the safety of hormone therapy drugs before you first marketed MPA.

12.    Produce documents relating, referring to or embodying all written procedures, standards and materials for the receipt and investigation of adverse event reports (AER's) relating to hormone therapy products, including but not limited to MPA.  This request includes directives;

orders and policy statements form the Directors and Officers; as well as employee manuals and memoranda.

13.     Produce all adverse event reports (AERs) in relation to the use of MPA. This request calls for records of reports, summaries, computerized data, analysis, or interpretation of reports.

14.     Produce all documents relating, referring to or embodying any investigation or follow-up by you or this defendant of AER's, including requests for medical records, medical records received, documents referencing discussions with physicians treating the person who alleged to have undergone an adverse reaction, consultations with your medical director, or with any consultants about an AER.

15.     Produce the name, address and telephone number, along with all documents relating, referring to or embodying the background training and experience, of every person who was a part of this Defendant's system monitoring adverse event reports (AERs).

16.     Produce all documents relating, referring to or embodying any correspondence or communications between any Defendant in this action and any physician, or other health care provider, regarding the safety or efficacy of hormone therapy drugs, including but not limited to, MPA.

17.     Produce all documents relating, referring to or embodying any studies, or tests or reviews, including clinical or epidemiological studies, of MPA to which you contributed time, resources or money.

18.     Produce all documents relating, referring to or embodying any participation or contribution (of time, money or recourses) by this Defendant to any person or entity, including trade associations, conducting a study about the use of MPA, or any other hormone therapy drugs, for whatever purpose.

19.     Produce all documents relating, referring to or embodying any deliberations by the management, officers and/or directors of Qualitest Pharmaceuticals, Inc., including minutes

6

of all Board of Directors meetings or other writings, which in any way refers to MPA or any other hormone therapy drug.

20.    Produce every document relating, referring to or embodying any opinion by a physician, a scientist, or expert in any field, while retained by any Defendant to this action regarding the safety of hormone therapy drugs, including but not limited to, MPA.  This request calls for reports prepared in legal proceedings, including expert designations in any civil or criminal proceedings; reports submitted to trade journals, scientific journals; opinions expressed at conferences or seminars, and reports or statements to the FDA, GAO or any government committee or regulatory authority, state or federal.

21.    Produce all reports, articles, text and data analysis (published or unpublished) this Defendant has, in the normal course of its business, relied upon to prove or allege that MPA, whether taken alone or in combination with other hormone therapy drugs, cannot cause serious adverse events such as breast cancer.

22.    Produce all documents relating, referring to or embodying any communications by this Defendant with any publisher, editor, author, reporter or employee of or for any lay, scientific, medical or news publication or any freelance writer concerning the safety of hormone therapy drugs, including but not limited to, MPA.

23.    Produce all documents that relate, refer to or embody any communication, report or inquiry between this Defendant and the Food and Drug Administration (FDA) in regard to AERs received by this Defendant.  (This request includes, but not limited to, writings showing every AER reported by each Defendant to the FDA.)

24.    Produce all documents relating, referring to or embodying any communications with any government committee, agency or regulatory    authority, state or federal, regarding any

regulation, restriction, label requirement or limitation on the sale of MPA, or any hormone therapy drugs. (This request includes, but is not limited to, submissions by Defendant's to the FDA, GAO, and State regulatory agency, and all documents evidencing communications received by Defendant's.)

26. Produce all labels ever used for MPA, including but not limited to each label ever used or proposed for use with this product.

26. Produce all documents relating to, referring to or embodying print advertising ever used by you for the sale of MPA.

27. As to any change in the MPA print advertisements that were made or considered by you, produce all documents relating to the change or proposed change. This request calls for all memorandum, minutes of meetings, or draft proposals, regarding any consideration, discussion, or decision about print ad revisions.

28. Produce all documents relating to, referring to or embodying standards or recommendations for product labeling from any industry or trade group that this Defendant has used or considered in making decisions about the content of any label ever used for MPA.

29. Produce all documents relating, referring to or embodying any press releases or public relations material about MPA which relates or refers to the safety of the product. Included in this request is material posted on any websites.

30. Produce all documents relating to, referring to, embodying, or describing the testing protocols, including chemical testing of ingredients, for the raw materials used in the finished MPA.

31. Produce all documents evidencing the total gross and net sales, and net profit, derived from the sale of MPA.

32.    The names, addresses and telephone numbers of each corporate director and officer of each Defendant, from 1995 to the present.

33.    The name, address, title and telephone number of each person assisting in, or providing information responsive to, answering these discovery requests.

34.    Produce a copy of this Defendant's Certificate of Incorporation, bylaws and/or mission statement.

35.    Any and all contracts between this Defendant and any other Defendant.

36.    Any and all communications between this defendant and all industry trade groups.

37.    Any and all documents evidencing contributions, either by way of annual fees, monthly fees, assessments, dues or the like, paid to any industry trade group.

38.    Any and all documents evidencing this defendant's participation, or any of its employees' participation in, any trade association, boards, or committees.

*Melissa Prickett*

Jere L. Beasley(BEA020)
Andy D. Birchfield, Jr. (BIR006)
Ted G. Meadows (MEA014)
Melissa A. Prickett (PRI068)
Attorneys for Plaintiff

OF COUNSEL:

BEASLEY, ALLEN, CROW, METHVIN,
    PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343

Myron C. Penn
PENN & SEABORN
Post Office Box 688

9

Clayton, Alabama 36016

## **CERTIFICATE OF SERVICE**

I hereby certify that I have filed a copy of the foregoing document with the Circuit Clerk along with the Summons and Complaint on this the 3rd day of June, 2005.

_____
OF COUNSEL

10

IN THE CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA

**FILED IN OFFICE**

JUN 0 3 2005

CLERK-REGISTER, BULLOCK CO., ALA.

| | | |
|---|---|---|
| **BARBARA D. GRAHAM;** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| v. | * | CASE NO. _CV-05-68_ |
| | * | |
| **WYETH d/b/a WYETH, INC.; WYETH** | * | |
| **PHARMACEUTICALS, INC.; QUALITEST** | * | |
| **PHARMACEUTICALS, INC.; BILL BLOUNT;** | * | |
| **WALTER WILLIAMS, III; JENNIFER** | * | |
| **ANDREWS; CHARLES H. PAYNE; BILL** | * | |
| **RICHARDS and Fictitious Defendants, A, B,** | * | |
| **C and D, being those persons, firms, or** | * | |
| **corporations who were sales representatives,** | * | |
| **detail persons and/or territorial** | * | |
| **managers soliciting doctors and/or** | * | |
| **pharmacies on behalf of the manufacturer of** | * | |
| **the drugs and who misrepresented and/or** | * | |
| **suppressed material information and/or who** | * | |
| **placed the same in the stream of commerce by** | * | |
| **distribution contributing to Plaintiff's injuries** | * | |
| **and damages; Fictitious Defendants E, F, G & H** | * | |
| **being those persons, firms or corporations whose** | * | |
| **fraud, scheme to defraud, and/or other wrongful** | * | |
| **conduct caused or contributed to the Plaintiff's** | * | |
| **injuries and damages, and whose true names and** | * | |
| **identities are presently unknown to the Plaintiff** | * | |
| **but will be substituted by amendment when** | * | |
| **ascertained,** | * | |
| | * | |
| **Defendants.** | * | |

## COMPLAINT

## STATEMENT OF FACTS

1.    Plaintiff Barbara D. Graham is an adult resident of Bullock County, Alabama.  Plaintiff Barbara D. Graham was prescribed and used the hormone therapy drugs Premarin, Prempro and Medroxyprogesterone Acetate ("MPA") from

approximately 1996 to approximately June 9, 2003. As a direct and proximate result of taking these drugs, Plaintiff was caused to suffer physical injury, including breast cancer. This action seeks monetary damages for the personal injuries and damages caused by these drugs.

2.    Defendant Wyeth d/b/a Wyeth, Inc., is a Delaware corporation with its principal place of business in New Jersey. At all times material hereto, Wyeth, Inc. was engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, and/or selling, either directly or indirectly, through third parties or related entities, hormone therapy drugs, including Premarin and Prempro in Alabama.

3.    Defendant, Wyeth Pharmaceuticals a/k/a Wyeth Pharmaceuticals, Inc., is a subsidiary or division of Wyeth, and is a Delaware corporation with its principal place of business in New Jersey. At all times material hereto, Wyeth Pharmaceuticals, Inc. was engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, and/or selling, either directly or indirectly, through third parties or related entities, hormone therapy drugs, including Premarin and Prempro in Alabama.

4.    Defendants Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. are hereafter collectively referred to as the "Wyeth Defendants."

5.    Defendant, Qualitest Pharmaceuticals, Inc., is an Alabama corporation with its principal place of business in Alabama. At all times material hereto, Qualitest Pharmaceuticals, Inc. was engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, and/or selling, either directly or indirectly, through third parties or related entities, hormone therapy drugs, including MPA in Alabama.

6.      Defendants Wyeth, Inc., Wyeth Pharmaceuticals, Inc. and Qualitest Pharmaceuticals, Inc. are hereafter collectively referred to as "Corporate Defendants."

7.      Defendant Charles H. Payne, upon information and belief, is a resident of the State of Alabama. Defendant Charles H. Payne was, at all times material hereto, a territory manager for the Wyeth Defendants and was acting within the course and scope of his employment with the Wyeth Defendants while transacting business in Alabama.

8.      Defendant Bill Richards, upon information and belief, is a resident of the State of Alabama. Defendant Bill Richards was, at all times material hereto, a district manager for the Wyeth Defendants and was acting within the course and scope of his employment with the Wyeth Defendants while transacting business in Alabama.

9.      Defendants Charles H. Payne and Bill Richards are hereafter collectively referred to as "Managers."

10.     Defendants Walter Williams, III, Bill Blount and Jennifer Andrews (hereinafter collectively referred to as "Sales Representatives") were, at all times material hereto, sales representatives for Wyeth and were acting within the course and scope of their employment with the Wyeth Defendants. Upon information and belief, these individuals are residents of the State of Alabama and, at all times material hereto, were in the business of marketing, selling and distributing the hormone therapy drugs Premarin and Prempro.

11.     Fictitious Defendants A, B, C & D are those persons, firms or corporations who were sales representatives, detail persons and/or territorial managers soliciting doctors and/or pharmacies on behalf of the manufacturer of the Premarin, Prempro, and MPA and who misrepresented and/or suppressed material information and/or who placed

3

the same in the stream of commerce by distribution contributing to Plaintiff's injuries and damages, and whose true names and identities are presently unknown to Plaintiff but will be substituted by amendment when ascertained. At all times relevant hereto, the Fictitious Defendants were in the business or marketing, selling and distributing Premarin, Prempro, and MPA in and/or from Alabama.

12.    Fictitious Defendants E, F, G & H are those persons, firms or corporations whose fraud, scheme to defraud, and/or other wrongful conduct caused or contributed to Plaintiff's injuries and damages, and whose true names and identities are presently unknown to Plaintiff but will be substituted by amendment when ascertained. At all times relevant hereto, the Fictitious Defendants were in the business or marketing, selling and distributing Premarin, Prempro, and MPA in and/or from Alabama.

13.    Upon information and belief, the Managers and Sales Representatives called on physicians, including Plaintiff's physician, Dr. Stuart May, on numerous occasions at which times they presented fraudulent information regarding the safety and efficacy of hormone therapy drugs and their harmful side effects, and/or fraudulently suppressed material information regarding the safety and efficacy of hormone therapy drugs and their harmful side effects, and/or misrepresented the efficacy of hormone therapy drugs and their harmful side effects, and/or placed hormone therapy drugs in the stream of commerce by providing Dr. May sample drugs at different potency levels.

14.    Plaintiff's claims accrued, in whole or in part, in Bullock County, Alabama, and Plaintiff resided in Bullock County, Alabama, at the time she was prescribed and took hormone therapy drugs, including Premarin, Prempro and MPA. The Corporate Defendants are foreign corporations currently engaged in business, directly or

4

by authorized agent, in Bullock County, Alabama. Upon information and belief, the Managers and Sales Representatives are individuals who, at all times material hereto, transacted business in Bullock County, Alabama. Venue and jurisdiction are, therefore, proper. Plaintiff's claims satisfy the jurisdictional amount of this Circuit Court.

15.    Hormone therapy drugs, including Premarin, Prempro and MPA, are prescription drugs designed to treat menopausal symptoms. Defendants did manufacture, design, market, sell and distribute these drugs. The defendants encouraged the use of these drugs in improper customers, misrepresented the safety and effectiveness of these drugs and concealed or understated their dangerous side effects. Defendants did this to increase sales.

16.    At all times material hereto, the Managers and Sales Representatives advertised, marketed, and/or promoted hormone therapy drugs to Plaintiff's prescribing physician utilizing information known to fraudulently represent the safety and efficacy of hormone therapy drugs, and the Managers and Sales Representatives failed to warn of the known dangers and adverse events associated with the use of hormone therapy drugs.

17.    At all times material hereto, the Managers and Sales Representatives placed hormone therapy drugs in the stream of commerce by distributing to physicians, including Plaintiff's physician, numerous samples of hormone therapy drugs at varying doses.

18.    As a direct and proximate result of the Defendants' acts or omissions, Plaintiff was caused to suffer injuries and damages, including, but not limited to, physical pain and suffering, mental and emotional anguish and distress, economic loss (including, but not limited to, medical and prescription expenses). Upon trial of this case, Plaintiff

will request the Court and Jury to determine fair compensation for the amount of loss which Plaintiff has incurred in the past and will likely incur in the future, not only from a financial standpoint, but also in terms of freedom from pain and worry.

19.    At all times relevant hereto, Defendants actually knew of the defective nature of their products as herein set forth, yet continued to design, manufacture, market, distribute and sell their products so as to maximize sales and profits at the expense of the general public's health and safety in conscious disregard of the foreseeable harm caused by these products.    Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, ill will, recklessness, gross negligence or willful and intentional disregard to the Plaintiff's individual rights, and hence punitive damages are appropriate.

20.    Hormone therapy medication is marketed to women who are going through menopause or have become fully menopausal.    Menopause describes a time in the natural aging process of a woman when her body's production of natural hormones such as progesterone and several types of human estrogens is dramatically reduced.    The physical symptoms of decreased levels of estrogen and progesterone include mood swings, hot flashes, loss of bone density, depression, irritability, night sweats and forgetfulness.    These symptoms range from being severe and disabling for some women to a minor inconvenience for other women.

21.    In 1942, Ayerst, the predecessor to Wyeth and Wyeth Pharmaceuticals, (hereafter collectively Wyeth) received approval for Premarin.    Premarin is a conjugated equine estrogen made from the urine of pregnant mares.    Premarin has remained chemically unchanged to this day.    At all material times, Wyeth has marketed Premarin

as a hormone "replacement" product, as it was intended to restore the natural human ovarian hormones, which include several forms of estrogen.

22.    Since 1942, Wyeth has vigorously promoted its menopausal hormone therapy products using a variety of marketing messages that emphasize long-term use of these medications.

23.    By way of example, the 1973 key marketing statement for Premarin was "start her on, keep her on." Even as late as 1991, Wyeth still represented that "protection continued only as long as estrogen therapy continued."

24.    To deliver this message to patients and doctors, Wyeth has used at least the following marketing methods:

    a.    Sponsoring medical journal articles;

    b.    Having detailing/sales representatives call on physicians;

    c.    Sponsoring continuing medical education programs;

    d.    Hiring doctors to speak to other doctors one on one or in small group meetings;

    e.    Issuing press releases;

    f.    Advertising directly to consumers:

    g.    Advertising to physicians in medical journals and materials; and

    h.  Sponsoring medical and pseudo-medical organizations to make statements.

25.    Using at least the methods above, Wyeth has extensively represented to physicians and the public the negative symptoms of menopause, ranging from hot flashes, night sweats and mood changes to an increased risk of life-changing and life-threatening conditions like cardiovascular problems, osteoporosis and dementia.

26.    Through a massive decades-long marketing and advertising campaign, Wyeth convinced doctors and the public that menopause is a disease requiring drug treatment rather than the natural process of aging.

27.    Wyeth's attempts to disguise menopause as a disease started decades ago. For instance, in 1962, Dr. Robert Wilson, a New York gynecologist, published an article in the *Journal of the American Medical Association* (*JAMA*), that claimed estrogen taken during menopause could <u>reduce</u> breast and genital cancers.

28.    In 1966, Dr. Wilson published a best-selling book entitled *Feminine Forever*. In *Feminine Forever*, Dr. Wilson described estrogen as the "cure" for "the tragedy of menopause." He argued that women who use hormone drugs "will be much more pleasant to live with and will not become dull and unattractive." In writing about the menopause condition, which he termed the "deficiency disease," Dr. Wilson wrote that "aside from keeping a woman sexually attractive and potent . . . estrogen preserves the strength of her bones, the glow of her skin, the gloss of her hair . . . Estrogen makes women adaptable, even-tempered, and generally easy to live with." Dr. Wilson asserted that estrogen *prevents* breast and genital cancers, such as endometrial cancer (i.e., cancer of the uterine lining).

29.    Unbeknownst to readers, Dr. Wilson was paid by Wyeth to write, publish, promote and market *Feminine Forever*. Wyeth disguised *Feminine Forever* as an independent project, but the book was nothing more than a promotional piece for Wyeth's estrogen products. There was no reliable science to support Dr. Wilson's assertions, including the claimed benefits of hormone therapy drugs.

8

30.    Soon after the publication, Wyeth' sales force began to distribute Dr. Wilson's book to physicians throughout the country.  Wyeth spent thousands of dollars supporting Dr. Wilson's promotional book tour.  As a result of Wyeth's covert and overt marketing efforts, sales of Premarin increased dramatically.

31.    As yet another example of Wyeth's over-promotion, in 1974 and 1975, Wyeth started a round of advertising that recommended Premarin as an alternative to tranquillizers for treating symptomatic or mild depression caused by menopause.

32.    Further, in a print advertisement that Wyeth published in the October 13, 1975, edition of *JAMA*, Wyeth claimed that Premarin can relieve "tension, irritability, headaches, undue fatigue, depression and insomnia" caused by declining menopausal estrogen levels.  At the top of the advertisement, in large print, Wyeth advised doctors, "Almost any tranquilizer might calm her down . . . but at her age, estrogen may be what she really needs."  The 1975 advertisements also stated: "In the treatment of middle-aged depression, there may be one thing to add . . . Premarin."  No clinical studies or reliable science supported these representations.

33.    In 1977, the Food & Drug Administration (FDA) issued a statement confirming that estrogen therapy should not be used to treat simple nervousness during menopause and that there was no scientific support for any representation that such therapy could keep a woman feeling young or keep her skin soft.

34.    By the mid-1970s, more than 30 million prescriptions for Premarin were being written every year, later making it the fifth most frequently prescribed drug in the United States.

9

35.    During the same period, a hormone therapy health epidemic arose. Two 1975 articles in the *New England Journal of Medicine (NEJM)* linked estrogen therapy to a significantly increased risk of endometrial cancer. Doctors then stopped prescribing Premarin to any woman with an intact uterus. Estrogen sales plummeted. By 1979, the only approved use of estrogen was for treatment of hot flashes and vaginal dryness.

36.    In 1979, Dr. Robert Greenblatt published an article in the *Journal of Geriatrics Society* that reported that "estrogen related uterine cancer can be avoided if progesterone is added to the regimen". Wyeth and other drug manufacturers immediately started promoting estrogen with an added progesterone component that together are known as combination hormone therapy.

37.    To obtain a patent on a prescription progesterone, Pfizer developed a synthetic hormone product called Medroxyprogesterone Acetate ("MPA") that Pfizer marketed under the brand name Provera. MPA has a different chemical makeup and a different effect than the natural hormone, progesterone, which is not patentable.

38.    Pfizer (and later generic MPA manufacturers like Qualitest) knew that Provera (and subsequent generic MPAs) did not have the same benefits as progesterone but had dramatically greater risks. Nevertheless, at least from the early 1980s until 1995, Wyeth promoted, marketed and encouraged the prescribing of Premarin or a generic estrogen in combination with Provera or a generic MPA. For instance, in 1985, Pfizer's advertising campaign for Provera included a color advertisement featuring Premarin and Provera as the preferred hormone therapy combination.

39.    Defendants created generic estrogen products as well as generic MPA products for use in combination hormone therapy. Despite having sufficient information

10

to know such combination therapy exposed patients to even greater risks than either prescription drug alone, Defendants avoided fully studying the risks and therefore never had enough information to tell doctors or the public the truth about these risks.

40.    In 1985, Wyeth put a new spin on the marketing of hormone therapy drugs by claiming that the drugs could help prevent bone loss. Wyeth hired a public relations firm to create public awareness of osteoporosis. After Wyeth learned that 77% of women had never heard of osteoporosis, Wyeth's public relations campaign moved into high gear to persuade women that osteoporosis is a devastating disease they should treat with Wyeth's drug, Premarin.

41.    Wyeth's public relations campaign created support for a National Osteoporosis Week and eventually for a National Osteoporosis Foundation (to which Wyeth financially contributed).

42.    Defendants represented to doctors, patients and the public that estrogen and combination hormone therapy drugs could prevent or reduce cardiovascular disease. Defendants' sales representatives encouraged doctors to prescribe hormone therapy even if a woman was not having menopausal symptoms because of the therapy's purported cardiac benefits.

43.    In fact, reliable scientific evidence has never supported these supposed benefits. Nevertheless, Defendants have recommended that physicians prescribe these hormone drugs in order to provide patients with purported cardiac protection.

44.    As a result of Wyeth's marketing efforts, between 1990 and 1995 Premarin became the most frequently dispensed prescription drug in the United States. All defendants saw dramatic increases in sales and profits. Increased sales arose from

11

marketing efforts aimed at promoting combination use of hormone therapy drugs without ever adequately warning of the risks.

45.    For example, in 1991, Defendants were aware that patients with a family history of breast cancer had a greater than three-fold increased risk of developing breast cancer from combination hormone therapy.    Defendants took steps to suppress the publication of this data and never publicly informed physicians of these statistics.    No defendant ever put a warning or contraindication in their hormone drugs' labeling to advise doctors of this dramatically increased risk for their patients with a family history of breast cancer.

46.    Yet another example of over-promotion occurred around 1993 when Wyeth distributed a videotape to consumers entitled, *"What every woman should know about Estrogen."*  This videotape claimed to be a "seminar for women."  It depicted a female doctor advising women about menopause and hormone therapy.  Wyeth's video "seminar" warned of a wide variety of illnesses and ailments purportedly associated with menopause.  Among other things, Wyeth represented that estrogen loss causes bones to become "brittle," skin to become "dryer" and sexual intercourse to become "painful and irritating."  While Wyeth's video was exhaustive in its warnings about menopause, it glossed over the dangers and risks associated with hormone therapy.  In its video, Wyeth also represented that estrogen provides "long-term health protection" and should be continued indefinitely, even after short-term menopausal symptoms, such as hot flashes, have subsided.  When asked in the video how long Premarin should be taken, a Wyeth doctor/spokesperson responded "anywhere from five to ten years in order to get protection from long-term problems."  Regarding breast cancer risks, Wyeth told women

12

that the benefits of taking estrogen "far outweigh" the risks for women, unless they faced a particularly high risk of breast cancer.

47.    Wyeth began marketing its hormone therapy drugs in a single pill called "Prempro" in 1994. Prempro combines the estrogenic compound CEE with the progestin MPA in a single pill taken once daily. "Premphase" is the brand name for a similar Wyeth product containing the same combination of compounds. Premphase delivers both CEE and MPA for part of the monthly regime, then CEE alone the rest of the month.

48.    Defendants have consistently downplayed studies isolating risks of hormone therapy. For example, in 1996, European scientists and researchers found that women with vertebral fractures had a 4.6 times increased risk of developing breast cancer if they took combination hormone therapy. These scientists felt that the risk of breast cancer associated with hormone replacement therapy had been substantially underestimated since osteoporosis is a primary indication for its use. Defendants started a "dismissive strategy" to "dismiss and distract" the U.S. press from covering these findings and made concerted efforts to keep the study results isolated in Europe. Defendants never informed physicians about this dramatically increased risk for patients with bone mass density problems, fractures or osteoporosis. Instead, Defendants promoted hormone therapy as something that could prevent osteoporosis and encouraged doctors to prescribe the drugs to these high risk patients.

49.    Soon after the introduction of Prempro, Wyeth agreed to fund a four-year heart disease prevention trial called "HERS: Heart and Estrogen/Progestin Replacement Study." Wyeth touted the study as one that would show that Prempro prevents heart disease in women who are at high risk. Wyeth was seeking FDA approval of the use of

13

Prempro to prevent or reduce the risk of heart disease. But in 1998, the HERS investigators reported that hormone therapy did not reduce the rate of coronary heart disease events in women with heart disease. In fact, HERS demonstrated that hormone therapy dramatically increases the risk of heart disease and heart attacks in those women, especially during the first year.   Wyeth and its sales representatives responded by minimizing or ignoring the HERS results.

50.    With no reliable science to support its assertions, Wyeth continued an aggressive marketing plan by promoting hormone therapy directly to women.   For example, beginning in early 1999, Wyeth distributed a brochure to women through the waiting rooms of physicians' offices that claimed, "Menopause isn't gone in a flash — its debilitating consequences can affect the rest of your life." The promotional brochure also directed women to "take a few minutes to think about the rest of your life" and listed a number of conditions which neither Prempro nor Premarin had been approved by the FDA to treat, including Alzheimer's disease, vision problems, tooth loss, heart disease and colon cancer.

51.    As yet another example, in a magazine advertisement that featured model Lauren Hutton, Wyeth made a rash of similar claims, suggesting its hormone therapy drugs were appropriate for treating or preventing, among other things, memory loss, colon cancer, and age-related vision loss. In the March 19, 2000, edition of *Parade Magazine,* Wyeth spokesperson Lauren Hutton (who was not identified as a Wyeth spokesperson) was asked what she did to look good and feel fit and she answered: "[M]y number 1 secret is estrogen. It's good for your moods; it's good for your skin. If I had to

choose between all my creams and makeup for feeling and looking good, I'd take the estrogen."

52.    By the late 1990s and early in 2000, Defendants knew about studies showing a significantly increased risk of breast cancer for women using combination hormone therapy. Indeed, studies showed a greater than four-fold increased risk of breast cancer. Despite this knowledge, Defendants (including Wyeth) minimized the risk in their package inserts by assuring doctors the risk was modest at most, with some studies showing no risk. Defendants' representations were false and misleading and were intended to downplay the cancer risks associated with hormone therapy.

53.    A cornerstone of Wyeth's marketing program was the promotion of hormone therapy for long-term use of indefinite duration. Specifically, *JAMA* reported that:

> In 2000, 46 million prescriptions were written for Premarin (conjugated estrogens), making it the second most frequently prescribed medication in the United States and accounting for more that $1 billion in sales, and 22.3 million prescriptions were written for Prempro (conjugated estrogens plus medroxyprogestrone acetate). While US Food and Drug Administration-approved indications for hormone therapy include relief of menopausal symptoms and prevention of osteoporosis, *long-term use has been in vogue to prevent a range of chronic conditions, especially heart disease* (emphasis added).

54.    Wyeth continually pressed the FDA to approve the use of Prempro to prevent or reduce the progression of heart disease in post-menopausal women. The FDA denied Wyeth's request because the agency did not believe there was sufficient scientific evidence to support such an indication/use of the drug, given the absence of reliable science from a controlled study to support Wyeth's assertions. Even though the FDA

15

refused to approve the use of Prempro to prevent development of heart disease, Wyeth continued to promote Prempro as having this benefit and even represented to physicians that Prempro reduced cardiovascular mortality by 50%.

55.    In the early 1990s, the Women's Health Initiative ("WHI") Study began. Conducted by the National Institutes of Health (NIH) and supported by Wyeth, this large-scale, controlled study was undertaken to confirm Prempro's heart, osteoporosis and mental cognition benefits.

56.    While Wyeth waited for the WHI study researchers to collect their data and reach their conclusions, Wyeth's overzealous hormone therapy marketing effort continued. For instance, at least until mid-2002, Wyeth distributed a hormone therapy promotional brochure targeted to women. The front cover stated: "Starting your Hormone Replacement Therapy (HRT)" and encouraged a woman to "Say yes to PREMPRO." The brochure featured testimonial statements from women taking Prempro, such as, "I wanted an HRT that was established, time tested, and had a successful track record. I'm delighted with PREMPRO" and "With PREMPRO, I know I've taken action to protect my health — and that's truly empowering." The unbalanced nature of Wyeth's marketing efforts is seen in the inadequate warnings contained in the "Side Effects" section of Wyeth's "Say yes to PREMPRO" brochure. In the warnings section, Wyeth describes only the risk of uterine cancer (associated with estrogen-only therapy), worsening diabetes, nausea, abdominal pain, irregular bleeding, headache, hair loss and breast tenderness.

57.    On July 9, 2002, the National Heart, Lung and Blood Institute ("NHLBI"), a federal agency and part of the National Institutes of Health ("NIH"), halted the WHI

16

study because the investigators concluded that, under the circumstances, the risks of taking Prempro outweighed its benefits. The scientific papers discussing the results of the WHI study provided the most comprehensive published data evaluating the risks and benefits of this drug combination of CEE and MPA. In July, 2002, the published results of the WHI provided the scientific and medical communities with important (although preliminary) information as to the varied and overwhelming risks associated with hormone therapy. Since July, 2002 there have been a number of additional findings and studies published. Other studies evaluating these risks are currently ongoing.

58.    The results of the WHI study and others like it contradict the scientific and medical assertions that all Defendants had made for decades about their respective products. Defendants told the medical community that the risks of these drugs is minimal whereas the drugs have great benefits ranging from relief of menopausal symptoms to the prevention of life-threatening medical conditions like heart disease and osteoporosis.

59.    The Women's Health Initiative (WHI) focused on defining the risks and benefits of strategies that could potentially reduce the incidence of heart disease, breast and colorectal cancer, and fractures in post-menopausal women. Between 1993 and 1998, the WHI enrolled 161,809 post-menopausal women volunteers between 50 and 79 years old. The study was conducted at 40 clinical centers in the United States and was scheduled to last for 15 years. Participants in the combination therapy arm of the WHI study received Prempro because it contained both the progestin MPA as well as the estrogenic compound Premarin. The Prempro arm of the WHI involved 16,608 women, ages 50 to 79 years, with an intact uterus. An important objective of the trial was to

17

examine the effect of this combination pill on the prevention of heart disease and hip fractures, and any associated change in risk for breast and colon cancer.

60.    In both 2000 and 2001, WHI investigators complied with a recommendation from the study's Data and Safety Monitoring Board (DSMB) to inform participants of a small increase in heart attacks, strokes, and blood clots in women taking hormones. The DSMB, an independent advisory committee charged with reviewing results and ensuring participant safety, found that the actual number of women having any one of these events was small and did not cross the statistical boundary established to ensure participant safety. Therefore, the group recommended continuing the trial.

61.    At the DSMB's meeting on May 31, 2002, the data review confirmed that the number of cases of invasive breast cancer in the estrogen plus progestin group had crossed the boundary established as a signal of increased risk. The DSMB recommended on May 31, 2002 that the trial be stopped. This decision was based on the finding of increased breast cancer risk, supported by the evidence of overall health risks exceeding any benefits. Beginning July 8, 2002, participants received letters about the results, telling them they should stop ingesting study medications.

62.    The WHI Study found that, for the Prempro arm, when compared to placebo, there was an overall increased risk of the following adverse events:

      a.    41 percent increase in strokes;

      b.    29 percent increase in heart attacks;

      c.    200 percent increase in venous thromboembolism (blood clots);

      d.    22 percent increase in total cardiovascular disease; and

      e.    26 percent increase in breast cancer.

18

63.    The WHI Study concluded that the "overall health risks exceeded benefits from use of combined estrogen plus progestin for an average 5.2-year follow-up among healthy post-menopausal US women." The Study also found that the combination hormone regimen should not be initiated or continued for the primary prevention of coronary heart disease.

64.    The report from the WHI investigators on the estrogen plus progestin study was so important that it was quickly released to the public on July 9, 2002, as an expedited article on the *JAMA* website. In commenting on the study's findings, NHLBI Director, Dr. Claude Lenfant, was unequivocal in his own conclusions:

> The cardiovascular and cancer risks of estrogen plus progestin outweigh any benefits—and a 26 percent increase in breast cancer risk is too high a price to pay, even if there were a heart benefit. Similarly, the risks outweigh the benefits of fewer hip fractures.

65.    Dr. Jacques Rossouw, acting director of the WHI and lead author of the JAMA article, gave a straightforward summary of the risks of combination hormone therapy:

> The WHI results tell us that during 1 year, among 10,000 post-menopausal women with a uterus who are taking estrogen plus progestin, *8 more will have invasive breast cancer, 7 more will have a heart attack, 8 more will have a stroke, and 18 more will have blood clots, including 8 with blood clots in the lungs*, than will a similar group of 10,000 women not taking these hormones. This is a relatively small annual increase in risk for an individual woman. Individual women who have participated in the trial and women in the population who have been on estrogen and progestin should not be unduly alarmed. However, even small individual risks over time, and on a population-wide basis, add up to *tens of thousands of these serious adverse health events* (emphasis added).

19

66.    Hormone drug therapy poses substantial health risks with little or no corresponding benefit.  This is especially true of the use of estrogen combined with synthetic progestin.  Defendants that sold only one part of the combination therapy (either an estrogen drug or generic MPA) promoted and marketed the combination therapy while knowing there was no scientific evidence supporting the safety or efficacy of the combination.  Indeed, all Defendants knew (or should have known) of the significant risks associated with the combination therapy.  However, all Defendants intentionally and knowingly marketed, promoted and encouraged the combination use of these two hormone drugs.  No Defendant ever conducted a controlled, long-term or well-designed study to monitor or evaluate the risks of combination hormone therapy.  No Defendant ever adequately or competently studied the relative effectiveness versus the risk of lowering the recommended dose of the combination drugs or of encouraging such combination use only for short durations.  Defendants that manufactured generic estrogen or MPA drugs relied upon Wyeth's and Pfizer's research, representations and promotion, failed to conduct their own studies or research to establish the safety or efficacy of these drugs and failed to provide complete and accurate information about their products.  Every defendant knew of the significant risks associated with combination therapy but failed to appropriately warn of such risks.  These risks include breast cancer, ovarian cancer, heart attacks, strokes, deep vein thromboembolisms, pulmonary embolisms, gallbladder cancer and non-Hodgkins hymphoma, among other side effects.

**Blood Clot Risks**

67.    Hormone therapy causes blood clots that, depending on where they occur or end up, result in strokes, heart attacks, thromboembolisms and pulmonary embolisms.

Manufacturing Defendants never adequately or appropriately warned physicians or users that estrogen therapy could cause or contribute to this risk.

**Breast Cancer Risks**

68.    Substantial scientific evidence supports the link between hormone therapy and breast cancer.  For instance, in addition to the WHI study results, a United Kingdom study found the same connection.  The August 9, 2003 issue of *Lancet,* reported the conclusions reached by *The Million Women Study*, a major research effort funded by Cancer Research UK, that confirmed that current and recent hormone therapy increases a woman's chance of developing breast cancer, and that the risk increases with duration of use.  Scientists at the Cancer Research UK analyzed data from over one million women between the ages of 50 and 64.  Researchers found that post-menopausal women using combination hormone therapy were twice as likely to develop breast cancer as non-users (a 100 percent increase).   Using *The Million Women Study* data, it is estimated that hormone therapy has caused more than 100,000 additional and unnecessary breast cancers in the United States of America alone.

69.    Further, an article published in *JAMA* on June 25, 2003 supplemented the initial WHI results.  The data reveal that in addition to stimulating the growth of breast cancer, combination hormone therapy makes breast tumors harder to detect, leading to dangerous delays in diagnosis.  Breast abnormalities can develop soon after a woman starts taking hormone therapy.  Consequently, the study's findings raise questions about the safety of even short-term hormone use.  The same issue of *JAMA* featured an editorial by Dr. Peter H. Gann, a cancer epidemiologist at Northwestern University, who stated

21

that this study represents "further compelling evidence against the use of combination estrogen plus progestin hormone therapy."

70.    Defendants never adequately or appropriately warned physicians or users that hormone therapy could cause or contribute to the risk of breast cancer. To this day, Defendants have never warned or advised of the link between hormone therapy and specific types of breast cancer, including ductal and lobular cancer.

**Ovarian Cancer Risks**

71.    Significant scientific evidence establishes that estrogen-only therapy causes ovarian cancer. For instance, an article regarding the risk of long-term use of estrogen-only therapy appeared in the same *JAMA* edition as the publication of the original WHI results. This article described the National Cancer Institute Study that found that women who took estrogen therapy were more likely to develop ovarian cancer than those not taking the drug. The NCI study is reported at Lacey JV Jr., et al., *Menopausal hormone replacement therapy and risk of ovarian cancer.* (*JAMA*. 2002 Jul 17; 288(3):334-41.) In the study, for 19 years, NCI researchers followed 44,241 women who were taking estrogen therapy only and found they had a 60% greater risk of ovarian cancer than women who had never used estrogen therapy. The risk increased proportionately with the duration of estrogen therapy use. Women who took estrogen therapy for 10 to 19 years had an 80% higher risk than those who did not. Those on estrogen therapy for 20 years or more were three times as likely to develop ovarian cancer as women who did not take it at all. Most of the NCI participants used Wyeth's brand of estrogen therapy, Premarin. Lead author of the NCI study, Dr. James V. Lacey, summarized the results:

> The main finding of our study was that post-menopausal women who used estrogen replacement therapy for 10 or more years were at significantly higher risk of developing ovarian cancer than women who never used hormone replacement therapy.

72.    Dr. Lacey further underscored the implications of his NCI study by explaining that the findings translate into one or two additional ovarian cancers each year per 10,000 women taking estrogen alone.  In 2000, eight million American women took Premarin, the leading estrogen therapy pill.  The Lacey study demonstrates that Premarin use is responsible for up to 1,600 additional ovarian cancer cases in the year 2000 alone.

73.    In October, 2003, the WHI Prempro trial produced a report with findings similar to the NCI study regarding ovarian cancer.  In the October 1, 2003, issue of *JAMA*, WHI researchers reported that combination hormone therapy caused a 58% increase in ovarian cancer rates.

74.    Defendants never adequately or appropriately warned physicians or users that estrogen therapy could cause or contribute to the development of ovarian cancer.

**Gallbladder Cancer Risks**

75.    Since 1997, Defendants knew (or should have known) that hormone therapy causes a statistically significant increased risk of gallbladder cancer in users. Manufacturing Defendants never warned physicians or users of this risk.

**Asthma Risks**

76.    Defendants knew (or should have known) that hormone therapy causes an increased risk of newly diagnosed asthma. Manufacturing Defendants never warned physicians or users of this risk.

23

**General Cancer Risks**

77.    In addition to the studies published in *JAMA, NEJM,* and other medical journals, a recent federal agency report also revealed that estrogen could be dangerous to women taking it as hormone therapy.  On December 11, 2002, the National Institute of Environmental Health Sciences released its tenth annual report on carcinogens, which confirmed that estrogen is a "known human carcinogen."

**No Real Benefit**

78.    Hormone therapy provides little real benefit beyond alleviating menopausal symptoms.  For even its approved indications, safer alternatives have provided better results with less risk.  Rather than providing any heart benefit or mental cognition benefit, hormone therapy actually dramatically increases the risk of heart attack and stroke, especially in the first year of use, and reduces mental functioning.  Hormone therapy is also linked to hearing loss and osteoarthritis.

**No Cardiac Benefits**

79.    Substantial scientific evidence reveals hormone therapy is counterproductive for heart protection.  For example, the August 7, 2003 issue of *NEJM* discussed additional WHI findings on the safety of hormone therapy use.  The study found that combination hormone therapy does not protect the heart and may even increase the risk of coronary heart disease (CHD).  Specifically, the WHI study found that combination hormone therapy usage was associated with a 24% overall increase in the risk of CHD (six more heart attacks annually per 10,000 women using combination therapy) and an 81% increased risk of CHD in the first year after starting combination therapy.

24

**No Unique Osteoporosis Benefits**

80.    Defendants knew (or should have known) that other therapies for osteoporosis, including Fosamax, provide better osteoporosis prevention and treatment benefits with less risk. For example, on May 21, 2003, *JAMA* published another study on the efficacy of estrogen plus progestin therapy (e.g., Prempro) for prevention of bone loss in elderly women. The study involved 373 women ages 65 to 90 who had either thinning bones or full-blown osteoporosis and who took one of four treatments for three years: (i) combination hormone therapy alone, (ii) a bone-building drug, alendronate (which is sold under the brand name, Fosamax), (iii) combination hormone therapy with Fosamax, or (iv) a placebo.    This study found that Fosamax alone was more effective than combination hormone therapy alone in combating osteoporosis.    After three years, hipbone density had increased nearly six percent in women on hormone therapy with Fosamax, four percent in those on Fosamax alone, and three percent in the hormone-only group. Yet, Defendants continued to over-promote and exaggerate the hormone drugs' purported benefits.

**No Mental Functioning Benefits**

81.    Substantial scientific evidence disproves any mental functioning benefits to hormone therapy. For instance, on May 28, 2003, *JAMA* published a study on the effects of hormone therapy that focused on the risks of Alzheimer's disease and other types of dementia.    The study found that Wyeth's combination hormone therapy, Prempro, doubled the risk of dementia for women who started hormones at age 65 or older. The dementia study was based on a four-year trial involving 4,532 women at 39 medical centers. Half the volunteers took placebo pills and half took Prempro. In four

years, there were 40 cases of dementia in the Prempro group and 21 in the placebo group. The results mean that for every 10,000 women 65 and older taking hormone therapy, there will be 45 cases of dementia a year with 23 of them attributable to hormone use. Dr. Sally A. Shumaker, the director of the dementia study and a professor of public health sciences at Wake Forest University, stated that the study's "clear message is that there's no reason for older women to be taking combination hormone therapy."

**No Substantial Quality of Life Benefits**

82.     Substantial scientific evidence reveals that quality of life benefits for hormone therapy are non-existent or negligible.  For instance, on March 17, 2003, the *NEJM* released a follow-up WHI study that reported hormone therapy failed to improve the quality of life for menopausal women.  The quality of life study examined the same pool of 16,000 WHI women and found that hormone therapy drugs do not provide the purported benefit that is the motivation for their use -- making women feel happier and healthier during and after menopause.  Women taking hormones did not report sleeping better or feeling better than women ingesting a placebo.  The hormone therapy group also did not report less depression or more sexual satisfaction than the placebo group.  According to the study's lead author, Dr. Jennifer Hays:  "It's just not something that's going to make most women feel better.  Even if it reduces your symptoms, that's not going to translate into a meaningful effect on a quality of life."

83.     For years, Defendants promoted combination hormone therapy as a safe and effective drug of prevention.  In reality, combination hormone therapy is dangerous, ineffective and counterproductive.

**Inadequate Warnings**

84.     The warnings and labels provided by Defendants were inadequate, misleading, and inaccurate.  Defendants minimized the risks of these drugs to prescribing physicians and ultimate users while simultaneously exaggerating the purported benefits.  Physicians and patients had no ability to conduct a realistic risk versus benefit assessment.

85.     Defendants provided inadequate warnings concerning hormone therapy as to breast cancer.  For instance, the Prempro warning mentioned the risk of breast cancer with conjugated estrogens (the Premarin component of Prempro) but emphasized that, with the addition of progestin, "the overall incidence of breast cancer does not exceed that expected in the general population."  The WHI study plainly reveals this warning is false and Wyeth and all other Defendants knew or should have known it to be false for decades.  Sales representatives or detailers for Defendants falsely represented there was no cancer risk or a minimal risk associated with hormone therapy drugs.

86.     Defendants provided inadequate warnings regarding the relationship between hormone therapy and blood clots. For example, the Prempro warnings expressly minimized the risks of thromboembolic disorders, pulmonary embolisms and venous blood clots with language such as "the increased risk [of venous thromboembolism] was found only in current ERT [i.e., Premarin only] users,"  "postmenopausal estrogen use does not increase the risk of stroke" and "embolic cerebrovascular events and myocardial infarctions have been reported," without disclosing the true nature of the risks.

87.     Defendants provided inadequate warnings concerning hormone therapy and its link to cardiac damage.  For example, under "Precautions," the Prempro

label acknowledged: "The effects of estrogen replacement therapy on the risk of cardiovascular disease have not been adequately studied."    Nevertheless, Wyeth consistently (and fraudulently) promoted the benefits of long-term hormone therapy for cardiovascular disease.  This promotion was "off-label," was not supported or permitted by the Food & Drug Administration and was used by Wyeth to fraudulently induce increased sales of hormone therapy drugs.

88.    Defendants provided inadequate warnings concerning the hormone therapy and its link to the other illness described herein.

89.    Defendants represented that hormone therapy was safe for long-term use. Wyeth did not abandon this long-standing marketing strategy until January 6, 2003 when Wyeth cautioned physicians in a "Dear Doctor" letter that "estrogens and estrogens plus progestin should be prescribed for the shortest duration consistent with treatment goals." In early June, 2003, Wyeth introduced a new public relations campaign consisting of full-page advertisements placed in 180 newspapers nationwide.  One advertisement, styled, "A Message from Wyeth," revealed Wyeth's abandonment of its long-term strategy of promoting long-term usage of Premarin and Prempro for post-menopausal women for a variety of conditions, stating in part:

> Hormone therapy is not a lifelong commitment…. As a result of recent studies, we know that hormone therapy should not be used to prevent heart disease.  These studies also report an increased risk of heart attack, stroke, breast cancer, blood clots, and dementia.    Therefore, it is recommended that hormone therapy (estrogen, either alone or with progestin) ***should be taken for the shortest duration*** at the lowest effective dose (emphasis added).

90.    Defendants represented that hormone therapy was safe at the dosages recommended over the years even though Defendants knew lower doses of these

medications are just as effective and less risky. It was not until 2003 that Defendants, including Wyeth, cautioned physicians to prescribe the lowest possible dose. Indeed, Wyeth built a new marketing strategy around the slogan, "Go low with Prempro," and launched a new, lower dose combination treatment.

91.     Defendants represented that hormone therapy had benefits without support from reliable science. They failed to conduct the necessary pre-approval research and post-approval surveillance to establish the safety of a long-term hormone therapy regimen. Defendants abdicated their responsibility, so that independent studies were necessary to uncover the serious risks Defendants knew or should have known about. Defendants never told physicians or the public that no long-term testing had been performed on these drugs, thereby fraudulently inducing physicians to prescribe these products and patients to use them, with the false assumption that such drugs had been sufficiently tested.

92.     Defendants were aware that MPA would be prescribed as a part of combination hormone therapy. Indeed, Defendants marketed, promoted and sold their MPA for such combination use. Defendants knew, or in the exercise of reasonable care should have known, that the synthetic progestin was harmful, was defective in design, would exaggerate or accelerate the harmful effects of estrogen and that the combination therapy of estrogen with MPA would be unreasonably dangerous. MPA, when used in combination hormone therapy, has deleterious effects, including but not limited to increasing the incidence of strokes, blood clots, heart attacks, breast cancer, and ovarian cancer. Even though Defendants knew of these risks, they did not warn consumers of the

serious adverse side effects of combination hormone therapy in any of their respective labels or promotional materials.

93.    Defendants, in their manufacture of generic equivalent and brand-name MPA, failed to conduct adequate pre-marketing clinical testing and research to determine the safety of MPA when used in combination with estrogenic compounds like Premarin.

94.    Defendants failed to conduct adequate post-marketing surveillance to determine the safety of MPA when used in combination with estrogenic compounds.

95.    Defendants never disclosed on their respective warning labels that such testing had not been performed, thereby fraudulently inducing physicians to prescribe and patients to ingest the MPA drugs with the false belief that these drugs had been adequately tested.

## COUNT I

96.    Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

97.    The hormone therapy drugs Premarin, Prempro and MPA, which were designed, developed, manufactured, packaged, labeled, marketed, advertised, sold, and/or distributed by Defendants, were placed in the stream of commerce in a defective and unreasonably dangerous condition as designed, taking into consideration the utility of the products and the risk involved in their use.

98.    Further, the hormone therapy drugs Premarin, Prempro and MPA, which were designed, developed, manufactured, packaged, labeled, marketed, promoted, advertised, sold, and/or distributed by the Defendants, were defective in marketing due to inadequate warnings or instructions.

99.    Further, the hormone therapy drugs Premarin, Prempro and MPA, which were designed, developed, manufactured, packaged, labeled, marketed, advertised, sold, and/or distributed by these Defendants, were defective and unreasonably dangerous due to inadequate testing.

100.    Additionally, Defendants failed to provide timely and adequate post-marketing warnings or instructions after the manufacturers knew of the risk of injury from the hormone therapy drugs Premarin, Prempro and MPA. The defective nature of these products is a contributing cause of Plaintiff's injuries.

101.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff was injured as described above.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT II

102.    Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

103.    Defendants had a duty to exercise reasonable care in designing, developing, manufacturing, packaging, labeling, marketing, promoting, advertising, selling, and/or distributing the hormone therapy drugs Premarin, Prempro and MPA.

104.    The Defendants failed to exercise ordinary care in designing, testing, developing, manufacturing, packaging, labeling, marketing, promoting, advertising, selling, and/or distributing of the hormone therapy drugs Premarin, Prempro and MPA.

The Defendants knew or should have known that the hormone therapy drugs Premarin, Prempro and MPA created an unreasonable risk of bodily harm.

105.    Despite the fact that the Defendants knew or should have known that the hormone therapy drugs Premarin, Prempro and MPA caused unreasonable, dangerous side effects which many users would be unable to remedy by any means, the Defendants continued to market the hormone therapy drugs Premarin, Prempro and MPA to physicians and consumers, including Plaintiff, when there were safer alternative methods of treatment.

106.    The Defendants knew or should have known that consumers, such as Plaintiff, would suffer injury or death as a result of the Defendants' failure to exercise ordinary care as described above.

107.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff was injured as described above.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.


## COUNT III

108.    Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

109.    Before Plaintiff was first prescribed the hormone therapy drugs Premarin, Prempro and MPA and during the period which she used the drugs, Defendants expressly warranted that the hormone therapy drugs Premarin, Prempro and MPA were safe.

110.    The hormone therapy drugs Premarin, Prempro and MPA failed to conform to these express representations of the Defendants in that they were not safe and had high levels of serious side effects, including life-threatening side effects, whether taken individually or in conjunction with other therapies.

111.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff was injured as described above.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT IV

112.    Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

113.    At the time Defendants packaged, labeled, promoted, marketed, advertised, sold, and/or distributed the hormone therapy drugs Premarin, Prempro and MPA for use by Plaintiff, the Defendants knew of the use for which the hormone therapy drugs Premarin, Prempro and MPA was intended and impliedly warranted the products to be of merchantable quality and safe and fit for such use.

114.    Plaintiff reasonably relied upon the skill and judgment of the Defendants as to whether the hormone therapy drugs Premarin, Prempro and MPA was of merchantable quality and safe and fit for its intended use.

115.    Contrary to such implied warranty, the hormone therapy drugs Premarin, Prempro and MPA were not of merchantable quality or safe or fit for its intended use

because the hormone therapy drugs Premarin, Prempro and MPA were unreasonably dangerous and unfit for the ordinary purposes for which they were intended.

116.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff was injured as described above.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT V

117.    Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

118.    Before Plaintiff was prescribed the hormone therapy drugs Premarin, Prempro and MPA and during the period in which she took the hormone therapy drugs Premarin, Prempro and MPA, Defendants negligently, recklessly, intentionally and fraudulently made material misrepresentations that the hormone therapy drugs Premarin, Prempro and MPA was safe.  The Defendants did so with the intent to induce physicians to prescribe and for consumers, including Plaintiffs, to purchase the hormone therapy drugs Premarin, Prempro and MPA.

119.    At the time the Defendants made these representations, the Defendants were aware of the falsity of these representations and/or made these representations with reckless disregard to their truth.  The Defendants made these representations with the intent to mislead.

120.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff was injured as described above.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT VI

121.    Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

122.    Before Plaintiff was prescribed the hormone therapy drugs Premarin, Prempro and MPA and during the period in which Plaintiff took the hormone therapy drugs Premarin, Prempro and MPA, Defendants fraudulently suppressed material information regarding the safety and efficacy of the hormone therapy drugs Premarin, Prempro and MPA and its harmful side effects in order to induce physicians to prescribe and consumers, including Plaintiff, to purchase the hormone therapy drugs Premarin, Prempro and MPA.

123.    At the time the Defendants suppressed the fact that the hormone therapy drugs Premarin, Prempro and MPA were not safe, the Defendants were under a duty to communicate this information to Plaintiff.

124.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff was injured as described above.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

Jere L. Beasley(BEA020)

Andy D. Birchfield, Jr. (BIR006)


Ted G. Meadows (MEA014)


Melissa A. Prickett (PRI068)

OF COUNSEL:

BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P. O. Box 4160
Montgomery, AL  36103-4160
(334) 269-2343

Myron C. Penn
PENN & SEABORN
Post Office Box 688
Clayton, Alabama 36016


## JURY DEMAND

Plaintiff respectfully demands trial by jury on all counts in this cause.


OF COUNSEL

36

IN THE CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA

BARBARA D. GRAHAM;                                    *
                                                     *
    Plaintiffs,                                  *
                                                     *
v.                                                   *    CASE NO. CV-05-68
                                                     *
WYETH d/b/a WYETH, INC.; WYETH                       *
PHARMACEUTICALS, INC.; QUALITEST                     *
PHARMACEUTICALS, INC.; BILL BLOUNT;                  *
WALTER WILLIAMS, III; JENNIFER                       *
ANDREWS; CHARLES H. PAYNE; BILL                      *
RICHARDS and Fictitious Defendants, A, B,            *
C and D, being those persons, firms, or             *
corporations who were sales representatives,         *
detail persons and/or territorial                    *
managers soliciting doctors and/or                   *
pharmacies on behalf of the manufacturer of          *
the drugs and who misrepresented and/or              *
suppressed material information and/or who            *
placed the same in the stream of commerce by         *
distribution contributing to Plaintiff's injuries    *
and damages; Fictitious Defendants E, F, G & H       *
being those persons, firms or corporations whose     *
fraud, scheme to defraud, and/or other wrongful      *
conduct caused or contributed to the Plaintiff's     *
injuries and damages, and whose true names and       *
identities are presently unknown to the Plaintiff    *
but will be substituted by amendment when            *
ascertained,                                         *
                                                     *
    Defendants.                                  *

## <u>SUMMONS</u>

    This service by certified mail of this summons is initiated upon the written request of Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

        NOTICE TO:        WYETH dba WYETH, INC.
                        c/o The Prentice-Hall Corporation System, Inc.
                        2711 Centerville Road, Suite 400
                        Wilmington, DE  19808.

The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to,

**Melissa A. Prickett**
**Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.**
**234 Commerce Street**
**P. O. Box 4160**
**Montgomery, Alabama  36103**

the attorneys for the Plaintiff. THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

Circuit Clerk

DATED: 6/3/05

IN THE CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA

BARBARA D. GRAHAM;                                *
                                                  *
    Plaintiffs,                             *
                                                  *
v.                                                *  CASE NO. *CV-05-68*
                                                  *
WYETH d/b/a WYETH, INC.; WYETH                    *
PHARMACEUTICALS, INC.; QUALITEST                  *
PHARMACEUTICALS, INC.; BILL BLOUNT;               *
WALTER WILLIAMS, III; JENNIFER                    *
ANDREWS; CHARLES H. PAYNE; BILL                   *
RICHARDS and Fictitious Defendants, A, B,         *
C and D, being those persons, firms, or           *
corporations who were sales representatives,      *
detail persons and/or territorial                 *
managers soliciting doctors and/or                *
pharmacies on behalf of the manufacturer of       *
the drugs and who misrepresented and/or           *
suppressed material information and/or who         *
placed the same in the stream of commerce by      *
distribution contributing to Plaintiff's injuries *
and damages; Fictitious Defendants E, F, G & H    *
being those persons, firms or corporations whose  *
fraud, scheme to defraud, and/or other wrongful   *
conduct caused or contributed to the Plaintiff's  *
injuries and damages, and whose true names and    *
identities are presently unknown to the Plaintiff *
but will be substituted by amendment when         *
ascertained,                                      *
                                                  *
    Defendants.                             *

## SUMMONS

    This service by certified mail of this summons is initiated upon the written request of Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

    NOTICE TO:        **WYETH PHARMACEUTICALS, INC.**
                                **c/o The Prentice-Hall Corporation System, Inc.**
                                **80 State Street**
                                **Albany, NY  12207**

The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to,

> **Melissa A. Prickett**
> **Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.**
> **234 Commerce Street**
> **P. O. Box 4160**
> **Montgomery, Alabama 36103**

the attorneys for the Plaintiff. THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

Circuit Clerk

DATED: 6/3/05

IN THE CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA

| | |
|---|---|
| BARBARA D. GRAHAM; | * |
| | * |
|     Plaintiffs, | * |
| | * |
| v. | *   CASE NO. _CV-05-68_ |
| | * |
| WYETH d/b/a WYETH, INC.; WYETH | * |
| PHARMACEUTICALS, INC.; QUALITEST | * |
| PHARMACEUTICALS, INC.; BILL BLOUNT; | * |
| WALTER WILLIAMS, III; JENNIFER | * |
| ANDREWS; CHARLES H. PAYNE; BILL | * |
| RICHARDS and Fictitious Defendants, A, B, | * |
| C and D, being those persons, firms, or | * |
| corporations who were sales representatives, | * |
| detail persons and/or territorial | * |
| managers soliciting doctors and/or | * |
| pharmacies on behalf of the manufacturer of | * |
| the drugs and who misrepresented and/or | * |
| suppressed material information and/or who | * |
| placed the same in the stream of commerce by | * |
| distribution contributing to Plaintiff's injuries | * |
| and damages; Fictitious Defendants E, F, G & H | * |
| being those persons, firms or corporations whose | * |
| fraud, scheme to defraud, and/or other wrongful | * |
| conduct caused or contributed to the Plaintiff's | * |
| injuries and damages, and whose true names and | * |
| identities are presently unknown to the Plaintiff | * |
| but will be substituted by amendment when | * |
| ascertained, | * |
| | * |
|     Defendants. | * |

## <u>SUMMONS</u>

    This service by certified mail of this summons is initiated upon the written request of Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

    NOTICE TO:        QUALITEST PHARMACEUTICALS, INC.
                          c/o William S. Propst, Sr.
                          130 Vintage Drive Northeast
                          Huntsville, AL  35811.

The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to,

> **Melissa A. Prickett**
> **Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.**
> **234 Commerce Street**
> **P. O. Box 4160**
> **Montgomery, Alabama  36103**

the attorneys for the Plaintiff. THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

Circuit Clerk

DATED: _6/3/05_

## IN THE CIRCUIT COURT OF
## BULLOCK COUNTY, ALABAMA

| | |
|---|---|
| **BARBARA D. GRAHAM;** | * |
| | * |
| **Plaintiffs,** | * |
| | * |
| **v.** | * CASE NO. *CV-05-68* |
| | * |
| **WYETH d/b/a WYETH, INC.; WYETH** | * |
| **PHARMACEUTICALS, INC.; QUALITEST** | * |
| **PHARMACEUTICALS, INC.; BILL BLOUNT;** | * |
| **WALTER WILLIAMS, III; JENNIFER** | * |
| **ANDREWS; CHARLES H. PAYNE; BILL** | * |
| **RICHARDS and Fictitious Defendants, A, B,** | * |
| **C and D, being those persons, firms, or** | * |
| **corporations who were sales representatives,** | * |
| **detail persons and/or territorial** | * |
| **managers soliciting doctors and/or** | * |
| **pharmacies on behalf of the manufacturer of** | * |
| **the drugs and who misrepresented and/or** | * |
| **suppressed material information and/or who** | * |
| **placed the same in the stream of commerce by** | * |
| **distribution contributing to Plaintiff's injuries** | * |
| **and damages; Fictitious Defendants E, F, G & H** | * |
| **being those persons, firms or corporations whose** | * |
| **fraud, scheme to defraud, and/or other wrongful** | * |
| **conduct caused or contributed to the Plaintiff's** | * |
| **injuries and damages, and whose true names and** | * |
| **identities are presently unknown to the Plaintiff** | * |
| **but will be substituted by amendment when** | * |
| **ascertained,** | * |
| | * |
| **Defendants.** | * |

## <u>SUMMONS</u>

    This service by certified mail of this summons is initiated upon the written request of Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

          **NOTICE TO:**        **BILL BLOUNT**
                                 **c/o WYETH dba WYETH, INC.**
                                 **Five Giralda Farms**
                                 **Madison, NJ  07940.**

The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to,

> Melissa A. Prickett
> Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
> 234 Commerce Street
> P. O. Box 4160
> Montgomery, Alabama 36103

the attorneys for the Plaintiff. THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

DATED: 6/3/05

Circuit Clerk

## IN THE CIRCUIT COURT OF
## BULLOCK COUNTY, ALABAMA

BARBARA D. GRAHAM;                                      *
                                                       *
    Plaintiffs,                                       *
                                                       *
v.                                                     *    CASE NO. *CV-05-68*
                                                       *
WYETH d/b/a WYETH, INC.; WYETH                         *
PHARMACEUTICALS, INC.; QUALITEST                       *
PHARMACEUTICALS, INC.; BILL BLOUNT;                    *
WALTER WILLIAMS, III; JENNIFER                         *
ANDREWS; CHARLES H. PAYNE; BILL                        *
RICHARDS and Fictitious Defendants, A, B,              *
C and D, being those persons, firms, or                *
corporations who were sales representatives,           *
detail persons and/or territorial                      *
managers soliciting doctors and/or                     *
pharmacies on behalf of the manufacturer of            *
the drugs and who misrepresented and/or                *
suppressed material information and/or who             *
placed the same in the stream of commerce by           *
distribution contributing to Plaintiff's injuries      *
and damages; Fictitious Defendants E, F, G & H         *
being those persons, firms or corporations whose       *
fraud, scheme to defraud, and/or other wrongful        *
conduct caused or contributed to the Plaintiff's       *
injuries and damages, and whose true names and         *
identities are presently unknown to the Plaintiff      *
but will be substituted by amendment when              *
ascertained,                                           *
                                                       *
    Defendants.                                       *

## <u>SUMMONS</u>

    This service by certified mail of this summons is initiated upon the written request of Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

        NOTICE TO:        WALTER WILLIAMS, III
                              c/o WYETH dba WYETH, INC.
                              Five Giralda Farms
                              Madison, NJ  07940.

The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to,

**Melissa A. Prickett**
**Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.**
**234 Commerce Street**
**P. O. Box 4160**
**Montgomery, Alabama  36103**

the attorneys for the Plaintiff. THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

Circuit Clerk

DATED: _6/3/05_

IN THE CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA

BARBARA D. GRAHAM;          \*
                                     \*

    Plaintiffs,              \*
                                     \*

v.                           \* CASE NO. _CV-05-68_
                                     \*

WYETH d/b/a WYETH, INC.; WYETH   \*
PHARMACEUTICALS, INC.; QUALITEST  \*
PHARMACEUTICALS, INC.; BILL BLOUNT; \*
WALTER WILLIAMS, III; JENNIFER    \*
ANDREWS; CHARLES H. PAYNE; BILL   \*
RICHARDS and Fictitious Defendants, A, B, \*
C and D, being those persons, firms, or  \*
corporations who were sales representatives, \*
detail persons and/or territorial     \*
managers soliciting doctors and/or    \*
pharmacies on behalf of the manufacturer of \*
the drugs and who misrepresented and/or  \*
suppressed material information and/or who \*
placed the same in the stream of commerce by \*
distribution contributing to Plaintiff's injuries \*
and damages; Fictitious Defendants E, F, G & H \*
being those persons, firms or corporations whose \*
fraud, scheme to defraud, and/or other wrongful \*
conduct caused or contributed to the Plaintiff's  \*
injuries and damages, and whose true names and\*
identities are presently unknown to the Plaintiff \*
but will be substituted by amendment when  \*
ascertained,               \*
                                     \*

    Defendants.              \*

## SUMMONS

    This service by certified mail of this summons is initiated upon the written request of Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

              NOTICE TO:      JENNIFER ANDREWS
                                   c/o WYETH dba WYETH, INC.
                                   Five Giralda Farms
                                   Madison, NJ  07940.

The Complaint which is attached to this summons is important and you must take immediate action to protect your rights.  You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to,

**Melissa A. Prickett**
**Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.**
**234 Commerce Street**
**P. O. Box 4160**
**Montgomery, Alabama  36103**

the attorneys for the Plaintiff.  THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.  You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

Circuit Clerk

DATED: 6/2/05

IN THE CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA

| | |
|---|---|
| BARBARA D. GRAHAM; | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * CASE NO. *CN-05-68* |
| | * |
| WYETH d/b/a WYETH, INC.; WYETH | * |
| PHARMACEUTICALS, INC.; QUALITEST | * |
| PHARMACEUTICALS, INC.; BILL BLOUNT; | * |
| WALTER WILLIAMS, III; JENNIFER | * |
| ANDREWS; CHARLES H. PAYNE; BILL | * |
| RICHARDS and Fictitious Defendants, A, B, | * |
| C and D, being those persons, firms, or | * |
| corporations who were sales representatives, | * |
| detail persons and/or territorial | * |
| managers soliciting doctors and/or | * |
| pharmacies on behalf of the manufacturer of | * |
| the drugs and who misrepresented and/or | * |
| suppressed material information and/or who | * |
| placed the same in the stream of commerce by | * |
| distribution contributing to Plaintiff's injuries | * |
| and damages; Fictitious Defendants E, F, G & H | * |
| being those persons, firms or corporations whose | * |
| fraud, scheme to defraud, and/or other wrongful | * |
| conduct caused or contributed to the Plaintiff's | * |
| injuries and damages, and whose true names and | * |
| identities are presently unknown to the Plaintiff | * |
| but will be substituted by amendment when | * |
| ascertained, | * |
| | * |
| Defendants. | * |

## SUMMONS

This service by certified mail of this summons is initiated upon the written request of Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

NOTICE TO:    CHARLES H. PAYNE
c/o Donald R. Jones, Jr.
2000 Interstate Park Drive, Suite 104
Montgomery, AL 36109

The Complaint which is attached to this summons is important and you must take immediate action to protect your rights.  You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to,

> **Melissa A. Prickett**
> **Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.**
> **234 Commerce Street**
> **P. O. Box 4160**
> **Montgomery, Alabama  36103**

the attorneys for the Plaintiff.  THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.  You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

Circuit Clerk

DATED: 6/3/05

IN THE CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA

|  |  |
|---|---|
| BARBARA D. GRAHAM; | * |
| | * |
| Plaintiffs, | * |
| | * |
| | * CASE NO. _CV-05-68_ |
| v. | * |
| | * |
| WYETH d/b/a WYETH, INC.; WYETH | * |
| PHARMACEUTICALS, INC.; QUALITEST | * |
| PHARMACEUTICALS, INC.; BILL BLOUNT; | * |
| WALTER WILLIAMS, III; JENNIFER | * |
| ANDREWS; CHARLES H. PAYNE; BILL | * |
| RICHARDS and Fictitious Defendants, A, B, | * |
| C and D, being those persons, firms, or | * |
| corporations who were sales representatives, | * |
| detail persons and/or territorial | * |
| managers soliciting doctors and/or | * |
| pharmacies on behalf of the manufacturer of | * |
| the drugs and who misrepresented and/or | * |
| suppressed material information and/or who | * |
| placed the same in the stream of commerce by | * |
| distribution contributing to Plaintiff's injuries | * |
| and damages; Fictitious Defendants E, F, G & H | * |
| being those persons, firms or corporations whose | * |
| fraud, scheme to defraud, and/or other wrongful | * |
| conduct caused or contributed to the Plaintiff's | * |
| injuries and damages, and whose true names and | * |
| identities are presently unknown to the Plaintiff | * |
| but will be substituted by amendment when | * |
| ascertained, | * |
| | * |
| Defendants. | * |

## SUMMONS

This service by certified mail of this summons is initiated upon the written request of Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

NOTICE TO:          BILL RICHARDS
                    c/o WYETH dba WYETH, INC.
                    Five Giralda Farms
                    Madison, NJ  07940.

The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to,

**Melissa A. Prickett**
**Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.**
**234 Commerce Street**
**P. O. Box 4160**
**Montgomery, Alabama  36103**

the attorneys for the Plaintiff. THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

Circuit Clerk

DATED: 6/3/05