2005 WL 1253829 Page 1
--- So.2d ---
(Cite as: 2005 WL 1253829 (Ala.))

NOT YET RELEASED FOR PUBLICATION.

Supreme Court of Alabama.
Ellis JOHNSON
v.
Andrew A. SORENSEN and Robert L. Bockrath.
1021945.

May 27, 2005.

Background: Former state university employee brought action against university president and athletic director, alleging, among other things, fraudulent suppression. The Tuscaloosa Circuit Court, No. CV-01-893, granted defendants summary judgment. Employee appealed.

Holding: The Supreme Court, Bolin, J., held that neither president nor director had a duty to inform employee that contract was subject to sovereign immunity.
Affirmed.

[1] Appeal and Error 863

30k863
In reviewing a summary judgment, the Supreme Court uses the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Rules Civ.Proc., Rule 56(c).

[2] Judgment 185(5)
228k185(5)
When the summary judgment movant makes a prima facie showing that no genuine issue of material fact exists, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. Rules Civ.Proc., Rule 56(c).

[3] Judgment 185(5)
228k185(5)
Evidence is substantial for purposes of creating a genuine issue of material fact in regards to summary judgment if it is of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved. Rules Civ.Proc., Rule 56(c).

[4] Appeal and Error 934(1)
30k934(1)
In reviewing a summary judgment, the Supreme Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Rules Civ.Proc., Rule 56(c).

[5] Fraud 16
184k16

[5] Fraud 58(1)
184k58(1)
In order to establish a prima facie claim of fraudulent suppression, a plaintiff must produce substantial evidence establishing the following elements: (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result.

[6] Fraud 17
184k17
A duty to disclose can arise either from a confidential relationship with the plaintiff or from the particular circumstances of the case.

[7] Fraud 20
184k20
Although the term "inducement" has often been used in the description of the fourth element of fraudulent suppression, it is clear that a plaintiff's reasonable reliance is an essential element of a suppression claim.

[8] States 191.1
360k191.1
Those dealing with the State are charged with knowledge of its immunity.

[9] Fraud 17
184k17
There is no duty to disclose laws that are accessible and presumed to be known by all.

[10] Fraud 17
184k17
State university president and athletic director had no duty to disclose to former employee that his contract with university was subject to sovereign immunity so as to support employee's fraudulent suppression claim, where no confidential relationship existed between the parties, the contract

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT G

2005 WL 1253829                                                                                                                          Page 2
(Cite as: 2005 WL 1253829 (Ala.))

specifically stated that the university did not waive any immunities, employee was aware of the doctrine of sovereign immunity and had access to an attorney, who advised him regarding his employment contracts, and neither the president nor the director knew whether employee could enforce his contract in a court of law.

BOLIN, Justice. [FN1]

*1 Ellis Johnson, who had been employed by the University of Alabama as an assistant football coach, sued the University of Alabama and its Board of Trustees (hereinafter referred to collectively as "the University") on July 12, 2001, alleging breach of an employment contract. [FN2] On August 10, 2001, the University moved to dismiss Johnson's complaint, asserting the defense of sovereign immunity under Art. I, § 14, Ala. Const.1901.

On November 30, 2001, Johnson amended his complaint to allege fraudulent suppression against the then president of the University of Alabama, Andrew A. Sorensen, [FN3] and the former athletic director, Robert L. Bockrath, [FN4] in their individual capacities. Johnson alleged that Sorensen and Bockrath had fraudulently suppressed the material fact that the liquidated-damages provision of his employment contract with the University of Alabama was not enforceable. Johnson also sought injunctive relief against Sorensen, Bockrath, and other representatives of the University of Alabama, seeking to enjoin them from signing any written agreement on behalf of the University that did not contain a warning as to the enforceability of those agreements.

The University, Sorensen, and Bockrath (hereinafter referred to collectively as "the University defendants") answered Johnson's amended complaint on April 19, 2002. The University defendants denied that Sorensen and Bockrath had acted in their individual capacities with regard to Johnson's employment contract, contending that at all times Sorensen and Bockrath had acted in their official capacities as the president and athletic director, respectively, of the University of Alabama and that they were, therefore, entitled to State-agent immunity. They additionally asserted as a defense to the fraud claim that misrepresentations of law will not support a fraud claim.

On July 12, 2002, Johnson amended his complaint a second time seeking a mandatory injunction requiring the University to pay him the liquidated damages he claims he is entitled to pursuant to his employment contract. The University defendants answered Johnson's second amended complaint on July 24, 2002, contending that Johnson was not entitled to a mandatory injunction because, they asserted, he was not owed any liquidated damages under his employment contract.

On August 30, 2002, Johnson amended his complaint a third time seeking a judgment declaring that the University had breached his employment contract and that he was owed liquidated damages under the employment contract. The University answered the amended complaint on September 12, 2002, reasserting the sovereign-immunity defense and contending that Johnson's employment contract had been terminated without cause when he resigned as an assistant football coach with the University of Alabama and accepted the position of head football coach at The Citadel.

On February 4, 2003, Johnson moved the trial court for a summary judgment as to his claims against the University, requesting that the trial court enter an injunction commanding the payroll clerk for the University of Alabama to pay him the liquidated damages he alleges are owed him. On February 5, 2003, the University defendants moved the trial court for a summary judgment as to all of the claims asserted by Johnson. Following a hearing, the trial court, on July 23, 2003, entered an order denying Johnson's summary-judgment motion and granting the University defendants' summary-judgment motion as to all of Johnson's claims. Johnson appeals only from the summary judgment entered on the fraud claims asserted against Sorensen and Bockrath.

*2 [1][2][3][4] In reviewing a summary judgment, we use the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. *Bussey v. John Deere Co.,* 531 So.2d 860, 862 (Ala.1988); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that no genuine issue of material fact exists, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. *Bass v. SouthTrust Bank of Baldwin County,* 538 So.2d 794 (Ala.1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." *West v. Founders Life Assurance Co. of Florida,* 547 So.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

870, 871 (Ala.1989). In reviewing a summary judgment, this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. *Hanners v. Balfour Guthrie, Inc.*, 564 So.2d 412 (Ala.1990).

The University hired Mike Dubose as its head football coach on January 2, 1997. Johnson was hired as an assistant football coach in January 1997, to serve on Dubose's coaching staff. Johnson's employment contract provided, among other things, that he could be terminated "with cause" or "without cause." The contract also contained a liquidated-damages provision that required the University to pay Johnson the "amount of [the] current annual base salary due for the remainder of the term of the Contract then in effect" if Johnson's employment contract was terminated without cause. The contract also contained the following provision: "It is expressly agreed and understood between the parties that nothing contained herein shall be construed to constitute a waiver by the University of its right to claim such exemptions, privileges, and immunities as may be provided by law." The contract was signed on behalf of the University by both Sorensen and Bockrath.

Johnson, Sorensen, and Bockrath executed an amendment to Johnson's employment contract on March 18, 1998. That amendment extended the term of the contract and restated in full the liquidated-damages provision. The restated liquidated-damages provision reads as follows:

"(f) *Liquidated Damages.* If the University terminates this Contract without cause prior to its expiration in accordance with the provisions of Section 5.01(e) hereof, the University shall pay, and [Johnson] agrees to accept as liquidated damages, at the option of University, either (1) the base salary payable under Section 4.01(a) as it becomes payable for the remainder of the Contract term then in effect (without reduction for any outside income); or (2) within thirty (30) days of termination the total amount of base salary due under Section 4.01(a) for the remainder of the term of the Contract then in effect.

*3 "The University's obligation hereunder shall be subject to [Johnson's] duty to mitigate the University's obligation as set forth in Section 5.01(j) hereof. Failure to timely pay such liquidated damages shall constitute a breach of this Contract, and such sum shall be recoverable, together with reasonable attorney's fees, in any such court of competent jurisdiction. [Johnson] will be entitled to continue such insurance at [Johnson's] own expense as required or permitted by law, but [Johnson] will not otherwise be entitled to any other employment or other benefit described in Article IV hereof.

"The parties have bargained for and agreed to the foregoing liquidated damages provision, giving consideration to the fact that termination of this Contract by the University without cause prior to its expiration may cause [Johnson] to lose certain benefits, supplemental compensation, or outside or athletically-related compensation relating to [Johnson's] employment at the University, which damages are extremely difficult to determine with certainty or fairly or adequately. The parties further agree that the payment of such liquidated damages by the University and acceptance thereof by [Johnson] shall constitute adequate and reasonable compensation to [Johnson] for the damages and injuries suffered by [Johnson] because of such termination by the University. The foregoing shall not be, nor be construed to be, a penalty."

Additionally, the amendment of the employment contract also added a mitigation-of-damages provision to Johnson's employment contract. That provision reads as follows:

"(j) *Mitigation of Liquidated Damages.* Notwithstanding the provisions of Section 5.01(f) hereof, [Johnson] agrees to mitigate the University's obligation to pay liquidated damages under Section 5.01(f) hereof and to make reasonable and diligent efforts to obtain comparable employment, such as a coaching or administrative position at a college or university or with a professional sports team, as soon as possible after termination of this Contract by the University pursuant to Section 5.01(e) hereof. The University's obligation to pay the liquidated damages provided for in Section 5.01(f) hereof shall cease as of the date of [Johnson's] acceptance of new employment. [Johnson] agrees to notify the University within fourteen (14) days of the date [Johnson] accepts new employment."

No other provisions of the contract were amended or changed. Thereafter, Johnson's employment contract was amended on several occasions to extend its term and to increase Johnson's rate of pay.

Dubose was terminated as the head football coach of the University of Alabama during the 2000 football season. Johnson testified that he and the other assistant coaches learned in a staff meeting with Mal Moore, who succeeded Bockrath as the athletic director after Bockrath's employment with

the University of Alabama ended in September 1999, that because their employment contracts were "tied" to Dubose's contract as the head football coach, their employment with the University of Alabama was also being terminated. Johnson testified in his deposition as follows:

*4 "[Counsel for University defendants]: How were you informed that you were going to be terminated at the University of Alabama, and when were you informed?

"[Johnson]: It is hard to explain. At one point we were at a staff meeting with Coach [Mal] Moore, and in meeting with us subsequent to terminating Coach Dubose he informed us, you know, that he-- he basically told us what would happen when the season was over, through the whole process. It was somewhat of an apology or regret that the whole thing happened, but we were informed at that time that we were not employed by--our contracts were tied to the head coach's contract, and therefore we were terminated also.

"That did not preclude the new coach from doing what he wanted to do in maybe hiring us. We had interviews, if you call it interviews with the new coach, sometimes early in December, you know, prior to Christmas, and at that time I was told that there was nothing on staff that I would be offered."

Johnson was offered the position of head football coach at The Citadel on December 22, 2000. Johnson testified that once he was offered the head coaching position at The Citadel, he contacted Moore to inform him that he wanted to accept the position but that he would not sign a contract with The Citadel until he had an opportunity to discuss the matter with Moore. Subsequently, Moore met individually with Johnson to discuss his employment situation. Johnson testified that he told Moore in the meeting that although the coaching position at The Citadel was inviting to him personally, he had some concerns because there were "some things about the job that [were] taking a step down" from his former position as an assistant football coach at the University of Alabama. Johnson stated that based on his understanding of his contract with the University, and after receiving the opinions of others, he asked Moore during the meeting to consider giving him as a settlement an amount that would equal the difference between what he would have received from his contract with the University and what he would receive from the proposed contract being offered by The Citadel. Johnson stated that Moore requested that he submit a written proposal to that effect. Johnson submitted the written proposal to Moore on January 3, 2001, and Moore rejected the proposal approximately three weeks later. Johnson accepted The Citadel's offer, and he began his employment as its head football coach on January 5, 2001. On March 22, 2001, Johnson submitted a second written settlement proposal to Moore, which Moore also rejected. Thereafter, Johnson sued the University.

This Court has stated:
"Under Article 1, § 14, Alabama Constitution of 1901, 'the State and its agencies have absolute immunity from suit in any court.' *Phillips v. Thomas,* 555 So.2d 81, 83 (Ala.1989); see also *Taylor v. Troy State University,* 437 So.2d 472, 474 (Ala.1983). 'This immunity extends to the state's institutions of higher learning.' *Taylor,* 437 So.2d at 474; see *Breazeale v. Board of Trustees of the University of South Alabama,* 575 So.2d 1126, 1128 (Ala.Civ.App.1991). 'State officers and employees, in their official capacities and individually, are also absolutely immune from suit when the action is, in effect, one against the state.' *Phillips v. Thomas,* 555 So.2d at 83; see *Taylor v. Troy State University,* 437 So.2d at 474. Those dealing with the State are charged with knowledge of its immunity. *McDowell-Purcell, Inc. v. Bass,* 370 So.2d 942, 944 (Ala.1979)."

*5 *Williams v. John C. Calhoun Cmty. College,* 646 So.2d 1, 2 (Ala.1994). See also *Ex parte Craft,* 727 So.2d 55 (Ala.1999). Further, in *Ex parte Cranman,* 792 So.2d 392 (Ala.2000)(plurality opinion), the following restatement of the law as it pertains to State-agent immunity was offered:

"A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

"(1) formulating plans, policies, or designs; or

"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

"(a) making administrative adjudications;

"(b) allocating resources;

"(c) negotiating contracts;

"(d) hiring, firing, transferring, assigning, or supervising personnel; or

"(3) discharging duties imposed on a department or agency by statute, rule, or regulation insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity
"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
792 So.2d at 405. This restatement of the law as it pertains to State-agent immunity was subsequently adopted by this Court's decisions in *Ex parte Rizk,* 791 So.2d 911 (Ala.2000), and *Ex parte Butts,* 775 So.2d 173 (Ala.2000).

Sorensen and Bockrath were engaged in the administrative function of negotiating Johnson's employment contract on behalf of the University; therefore, they were entitled to State-agent immunity unless their conduct in negotiating Johnson's employment contract took them outside the blanket of protection afforded them by the doctrine of State-agent immunity. Here, Johnson amended his complaint alleging breach of contract against the University to assert against Sorensen and Bockrath a claim of fraudulent suppression. Because the University had raised sovereign immunity as a defense to the breach-of-contract claim, Johnson contended that Sorensen and Bockrath had fraudulently suppressed the fact that the liquidated-damages provision of his contract was not actually enforceable "in any such court of competent jurisdiction" as provided in the amendment to the original employment contract. Johnson testified that he would never have entered into an employment contract and gone to work for the University of Alabama if he had known he had no way to enforce the contract. Sorensen and Bockrath answered Johnson's amended complaint and asserted State-agent immunity as a defense. They also asserted as a defense that the statement that the liquidated-damages provision is enforceable "in any such court of competent jurisdiction" was actually a misstatement of the law and would not support a fraud claim.

*6 [5][6][7] In order to establish a prima facie claim of fraudulent suppression, a plaintiff must produce substantial evidence establishing the following elements:
" '(1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result.' "
*Waddell & Reed, Inc. v. United Investors Life Ins. Co.,* 875 So.2d 1143, 1161 (Ala.2003) (quoting *State Farm Fire & Cas. Co. v. Slade,* 747 So.2d 293, 323-24 (Ala.1999)). "A duty to disclose can arise either from a confidential relationship with the plaintiff or from the particular circumstances of the case." *Ex parte Farmers Exch. Bank,* 783 So.2d 24, 27 (Ala.2000). " 'Although the term "inducement" has often been used in the description of the fourth element of suppression, it is clear that a plaintiff's ["reasonable reliance"] is an essential element of a suppression claim. See *Liberty Nat'l Life Ins. Co. v. Sherrill,* 551 So.2d 272, 273 (Ala.1989)....' " *Allstate Ins. Co. v. Ware,* 824 So.2d 739, 744-45 (Ala.2002) (quoting *Ex parte Household Retail Servs., Inc.,* 744 So.2d 871, 879 (Ala.1999)). See also *Foremost Ins. Co. v. Parham,* 693 So.2d 409 (Ala.1997)(referring to reasonable-reliance standard).

Sorensen testified that he did not discuss with counsel for the University of Alabama the assistant coaches' employment contracts in as much detail as he did the head coach's employment contract or the athletic director's employment contract. He stated that he also did not read the assistant coaches' employment contracts with the same care with which he read the head coach's or the athletic director's employment contract. Sorensen stated that he gave Johnson's employment contract only a cursory reading.

Sorensen testified that he did not know whether Johnson could seek to enforce his employment contract in a court of law and that he never discussed with counsel for the University of Alabama whether Johnson's employment contract was enforceable in a court of law. Sorensen testified that although he was aware that public universities were immune from certain "kinds of suits," he did not know what kinds of suits those were. Sorensen stated that he was not "competent" with regard to

2005 WL 1253829 Page 6
(Cite as: 2005 WL 1253829, *6 (Ala.))

the judicial system and that he did not know what constituted a court of competent jurisdiction. He also testified that he had no legal expertise with which to interpret the provisions of an assistant coach's employment contract.

Bockrath testified that he approved and signed Johnson's employment contract after he had reviewed it. He stated that he assumed the contract was a binding and enforceable agreement. Bockrath testified that he did not understand the meaning of the term "court of competent jurisdiction" and did not know what courts could be called upon to enforce the employment contract, should that become necessary. Bockrath testified that when Johnson's employment contract was submitted to him for review, he had no understanding whatsoever of the doctrine of sovereign immunity. He further testified that he did not convey any information to Johnson regarding sovereign immunity.

*7 Johnson is a graduate of The Citadel; he had previously worked as an assistant football coach at Clemson University, the University of Southern Mississippi, East Carolina University, and Appalachian State University. Johnson also had been previously employed by the University of Alabama as an assistant football coach on Gene Stallings's coaching staff.

As mentioned above, Johnson's employment contract contained a provision expressly stating that nothing in the contract shall be construed to constitute a waiver by the University of any privileges or immunities that may be provided the University by law. Although Johnson testified that no one at the University of Alabama, including Sorensen or Bockrath, ever explained the doctrine of sovereign immunity to him, he was aware of the doctrine of sovereign immunity because he stated that other people--not in connection to this proceeding--had explained it to him, but he testified that he did not understand the doctrine in "technical legal terms." Johnson testified that a lawyer who practices contract law in the field of sports law had advised him on his employment contracts for seven to eight years prior to this litigation. He stated that when he entered into the employment contract with the University of Alabama and subsequently agreed to its amendment he had access to that lawyer.

[8][9][10] After reviewing the record in this case, we conclude that Johnson failed to establish a prima facie case of fraudulent suppression. Johnson failed to present substantial evidence indicating that Sorensen or Bockrath owed him a duty to disclose the applicability of the doctrine of sovereign immunity to his employment contract. No confidential relationship existed between Sorensen, Bockrath, and Johnson, and the particular circumstances of this case would not give rise to a duty to disclose. Further, those dealing with the State are charged with knowledge of its immunity. *Williams, supra.* Additionally, there is no duty to disclose laws that are accessible and presumed to be known by all. *Henson v. Estes Health Care Ctr., Inc.,* 439 So.2d 74 (Ala.1983). Johnson's contract specifically stated that the University did not waive any of the immunities afforded it by law. Johnson is a college graduate, and he had coached at other universities, including a previous tenure at the University of Alabama. He was aware of the doctrine of sovereign immunity; he had access to an attorney who practiced in the field of sports law who advised him with regard to his employment contracts. Nothing in the record indicates that Johnson's entering into the employment contract and later agreeing to its amendment was anything other than an arm's length transaction.

Johnson also failed to present substantial evidence indicating that Sorensen and Bockrath suppressed a material fact of which they had knowledge. Those dealing with the State are charged with knowledge of its immunity. *Williams, supra.* Again, Johnson's employment contract expressly stated that the University was not waiving any immunities afforded it by law. Sorensen testified that he did not know whether Johnson could seek to enforce his employment contract in a court of law and that he never discussed with counsel for the University of Alabama whether Johnson's employment contract was enforceable in a court of law. He stated that he did not know what constituted a court of competent jurisdiction. He also testified that he was aware that public universities were immune from certain "kinds of suits," but that he did not know what kinds of suits those were. Sorensen further stated that he read Johnson's contract only cursorily and that he had no legal expertise with which to interpret the provisions of an employment contract. Bockrath testified that he did not understand the meaning of the term "court of competent jurisdiction" and that he did not know what courts could enforce the employment contract. Bockrath testified that at the time Johnson's employment contract was submitted to him for review, he had no understanding whatsoever of the doctrine of sovereign immunity.

*8 Additionally, we note that the trial court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1253829                                                                                                     Page 7
(Cite as: 2005 WL 1253829, *8 (Ala.))

concluded in its order that the alleged misrepresentation in this case was a misstatement of law, which is not actionable. We agree. This Court has stated:
  "In *Best v. Best,* 247 Ala. 627, 629, 25 So.2d 723, 725 (1946), this Court held:
  " ' "It has been said that misrepresentation or concealment as to matter of law cannot constitute remedial fraud, because everyone is presumed to know the law, and therefore cannot in legal contemplation be deceived by erroneous statements of law, and such representations are ordinarily regarded as mere expressions of opinion on which the hearer has no right to rely. Further, it has been held that a charge of fraud cannot be predicated on an honest error in a statement of the law. But misrepresentations involving a point of law will be held actionable misrepresentations of fact if it appears that they were so intended and understood as where they amounted to an implied assertion that facts existed which justified the conclusion of law expressed...." '
  "Quoting *Clayton v. Glasscock,* 221 Ala. 3, 127 So. 538 (1930).
  "Similarly, the Court of Civil Appeals held in *Spry Funeral Homes, Inc. v. Deaton,* 363 So.2d 786, 789 (Ala.Civ.App.1978), that a misrepresentation of law constituted actionable fraud where the defendant had his attorney draft a void contract and 'the defendant then induced plaintiff to sign the agreement in reliance on the fact that the contract was legally binding and enforceable.' In *Arkel Land Co. v. Cagle,* 445 So.2d 858 (1983), this Court found actionable fraud where an attorney acting as the agent of the defendant intentionally misled the plaintiff lessors as to the legal effect of two mining leases in order to induce them to sign the leases."
*Empiregas, Inc. v. Hardy,* 487 So.2d 244, 248-49 (Ala.1985)

The alleged misrepresentation in this case differs from the intentional misrepresentations contemplated by *Empiregas, Spry Funeral Homes, Inc. v. Deaton,* 363 So.2d 786 (Ala.Civ.App.1978), and *Arkel Land Co. v. Cagle,* 445 So.2d 858 (Ala.1983). Here, there are no facts to support an implication that Sorensen or Bockrath intended to convey to Johnson--or that Johnson understood--that the phrase "recoverable ... in any such court of competent jurisdiction" meant anything other than what it said, and, therefore, was anything other than an honest error in a statement of the law. *Empiregas, supra.* As discussed above, the evidence presented indicates that Sorensen and Bockrath had little, if any, understanding of the doctrine of sovereign immunity and what constituted a court of competent jurisdiction.

Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

NABERS, C.J., and SEE, HARWOOD, and STUART, JJ., concur.

> FN1. This case was originally assigned to another Justice; it was reassigned to Justice Bolin on January 28, 2005.
>
> FN2. On October 31, 2001, Johnson also filed a claim with the Alabama Board of Adjustment seeking liquidated damages he contended he was entitled to pursuant to his employment contract with the University. The University answered Johnson's claim and alleged that he was not entitled to any liquidated damages pursuant to this employment contract. The Board of Adjustment is apparently holding Johnson's claim in abeyance pending the outcome of this action.
>
> FN3. Sorensen served as president of the University of Alabama from 1996 until July 1, 2002.
>
> FN4. Bockrath served as the athletic director for the University of Alabama from July 8, 1996, until September 21, 1999.

2005 WL 1253829 (Ala.), 22 IER Cases 1881

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.